**MENDELSON et al. v. UNITED STATES.**

**No. 5480.**

Court of Appeals of the District of Columbia.
Argued March 7, 1932.

Decided April 4, 1932.
Rehearing denied April 23, 1932.

E. Russell Kelly and Myron G. Ehrlich, both of Washington, D. C., for appellants Mendelson and La Bolo.

T. Morris Wampler, of Washington, D. C., for appellants Lerner and Kushner.

James A. O'Shea, of Washington, D. C., for appellant Corbin Shields.

Charles E. Ford, of Washington, D. C., for appellant Jack Baum.

Leo A. Rover, James R. Kirkland, and John J. Wilson, all of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, and GRONER, Associate Justices.

GRONER, Associate Justice.

This case originated in an indictment against twenty-two defendants for conspiracy to violate the prohibition law. Four pleaded guilty; four were not tried, three being fugitives; there was a directed verdict in the case of two; one was acquitted; and eleven convicted. Five of those convicted accepted sentence. Six have appealed. The cases of five of these six we regard as identical and shall speak of them hereafter as defendants. The case of one of them, Shields, we shall discuss separately.

The indictment charges a conspiracy to unlawfully transport intoxicating liquors from within and without the District of Columbia, and, more specifically, the transportation of liquors from named points in Maryland to designated addresses in the city of Washington, and to unlawfully possess the liquor and to unlawfully solicit its sale, and to unlawfully maintain a place in which it was stored and from which it was sold, and concludes with a number of overt acts within the District of Columbia. A demurrer and a motion to quash were overruled, and one of the defendants made a motion for a bill of particulars, which was likewise overruled. The action of the court in these respects is assigned as error.

The ground of the demurrer is that the indictment does not sufficiently charge an offense, but we think it does. While it is not as "wide as a barn nor as deep as a well," we think it sufficiently charges the conspiracy and its unlawful purposes and facts from which it sufficiently appears that the object of the conspiracy was the commission of offenses against the United States, and we think these offenses are described with sufficient certainty and detail not only to apprize the defendant of the nature of the charge against him, but with enough particularity to make effective a plea in bar should he be subsequently prosecuted for the same offense. This is all that is necessary. See Malinow v. United States (C. C. A.) 42 F.(2d) 374.

We think also that the action of the court was correct in overruling the motion filed in behalf of one of the defendants for a bill of particulars. The motion requested a statement of the facts relied upon to support the allegations of the overt act charged against this defendant and also the facts relied upon to connect the defendant with the conspiracy. To require the prosecution to make such a statement as this is not ordinarily the function of a bill of particulars. The overt act as alleged is that this defendant on the 25th day of February, 1930, in the District of Columbia, and during the existence of the conspiracy, caused a large quantity of liquor to be brought from the state of Maryland into the District of Columbia. To require the prosecution to state in detail the exact point in Maryland or the exact point in the District of Columbia would be to require

534

it to discover its entire case and the evidence upon which it would rely. The charge included the time and in a general way the place and transportation. This, we think, was enough. And the same answer suffices for the second ground. See Dunbar v. United States, 156 U. S. 185, 15 S. Ct. 325, 39 L. Ed. 390; Rubio v. United States (C. C. A.) 22 F.(2d) 766. Regardless of this, we would not reverse on this ground unless satisfied that appellant was taken by surprise in the course of the trial or that his rights were prejudiced, and this does not appear. See Wong Tai v. United States, 273 U. S. 77, 47 S. Ct. 300, 71 L. Ed. 545.

The next assignment of error relates to the refusal of the court to grant certain asked prayers, and also to certain remarks of the court to the jury, which it is said were objectionable. We find no error in either respect.

■■■ The general charge made by the court to the jury adequately covered all of the specific points raised in behalf of any of the defendants, and at its conclusion the only point made by any of counsel was the failure of the court to give a specific instruction asked on the subject of the weight, etc., to be given the evidence of accomplices. Most of the instructions asked relate to the presumption of innocence and the definition of reasonable doubt. The language used by the court in charging on these matters amply covered both subjects, and was in the form almost habitually used in relation to them. The remarks of the court which are criticized relate to the two defendants as to whom binding instructions were given, and the judge, in telling the jury to find them not guilty, said that, after a careful examination and review of the evidence, he was of opinion that it was not sufficient to justify a conviction as to them. This seems to us an entirely proper way in which to acquaint the jury with the fact that their duty was to acquit these two defendants, and, if the others who were not freed suffered any prejudice because of it, it grew out of their situation as joint defendants rather than the manner in which it was accomplished. But, even if this were otherwise, the record does not show that any exception was taken to the remarks of the court, which in itself would make it improper to review the question. See our opinion in Norman v. United States, 20 App. D. C. 494, 497, in which we said: "It would not be fair to the court or to the jury, or to the parties to the cause, to permit it [the court's charge] to pass unchallenged at the time, and then on account of it to seek reversal in the appellate tribunal."

■■■ The requested charge with relation to the testimony of accomplices told the jury that such testimony should not be received as that of an ordinary witness—an ordinary witness of good character whose testimony is generally and prima facie supposed to be correct. Some of the defendants in addition requested that the court caution the jury "about convicting the defendant upon the uncorroborated testimony" of the accomplices—some others, that the jury "would have to inquire into the facts as to whether or not there is corroborating testimony." The court instead charged as follows:

"The court instructs you upon this subject that it is the settled rule in this country that accomplices in the commission of crime are competent witnesses, and that the Government has the right to use them as witnesses. It is the duty of the court to admit their testimony, and that of the jury to consider it. It should be received with caution and scrutinized with care. The degree of credit which should be given such testimony is matter exclusively within the province of the jury. You may as a matter of law convict a person accused of a grave crime upon the uncorroborated testimony of an accomplice, but you should do so only after you have carefully and cautiously scrutinized such testimony."

Whatever may have been said on this subject before in prior cases, there is no longer any doubt that a jury may convict on the uncorroborated testimony of accomplices. Caminetti Case, 242 U. S. 470, 37 S. Ct. 192, 198, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168. While this is so, the better practice is, as the Supreme Court said in the last-mentioned case, to caution juries "to require corroborating testimony before giving credence to such evidence." We therefore had occasion to say in Borum v. United States, 61 App. D. C. 4, 56 F.(2d) 301, 305, speaking of the testimony of accomplices, that "the court should, of its own motion, have cautioned the jury to weigh it carefully and not to give it too much reliance."

In the present case, as we have already seen, the judge told the jury to receive the testimony with caution and scrutinize it with care, and, on the subject of corroboration, the court said: "If you find that they (accomplices) are substantially corroborated by independent evidence with respect to material parts of their testimony, you should then give their entire testimony such weight as in your opinion it deserves." We are satisfied that the charge as given by the court on this phase

no

of the case was all that is required, and all that any defendant charged with crime and confronted by the testimony of accomplices has a right to ask.

It is next objected that the action of the court in keeping the jury together from 5:30 p. m. April 28 to approximately midnight the following day amounted to coercion. We have noticed the point merely that it may be seen that we have not overlooked it, but obviously no good purpose would be served in discussing it. It is a matter of common knowledge that juries in important cases are frequently kept together for periods longer than was the case here. There is no yardstick in such matters, and the question is one within the sound discretion of the trial court.

Nor are we any more impressed with the point that the court's supplementary charge was improper. In substance, it amounted to telling the jury that they should consider their verdict with a proper regard to the opinions of each other, but at the same time cautioning them that the verdict must be reached as a result of each juror's own convictions, and should not be a mere acquiescence in the conclusion of his fellows. See Lias v. U. S. (C. C. A.) 51 F.(2d) 215, affirmed (p. c.) 284 U. S. 584, 52 S. Ct. 128, 76 L. Ed. —— (Nov. 1931). While we think it is better to avoid, if possible, the practice of supplementary charges to the jury, the matter is one which is not forbidden by absolute rule, and the propriety must, in the nature of things, be left largely in the discretion of the trial judge.

The only other point made is in relation to the argument of the district attorney to the jury. The part of the argument objected to related to the defendant La Bolo, as to whom the district attorney said: "He was only there on one occasion and there was only one transaction, but you should find him guilty, and * * * you can bring in a verdict in this case with recommendation of mercy with reference to La Bolo." We think the statement or suggestion in that form should not have been made, for it is always improper on the part of the prosecuting officer to suggest to the jury, directly or indirectly, that they should surrender any of their responsibility with the idea that the court will see to it that no injustice results, but we think the statement was not prejudicial in the circumstances, because the judge, when the matter was brought to his attention by an objection, stated to the jury that they should not be prejudiced by the statement, and that their duty was to find the defendant

guilty or not guilty, as to which they were exclusively to judge the facts. Besides this, the prejudice, if any, was to the defendant La Bolo, and he did not object.

In conclusion as to this branch of the case, we need only remark that we have been at pains to examine the evidence carefully, and we think it sustains the indictment that there was a conspiracy to violate the prohibition law to which appellants were parties. The conspiracy contemplated the setting up and operating of a still for the manufacture of alcohol in Maryland and for its transportation from Maryland into the District of Columbia for sale in the bootleg trade. Appellants worked together to a common end, and, though in different departments or with different degrees of responsibility, all were an essential part in the common enterprise.

The case of the defendant Shields we have considered apart from the others, and this because it is insisted on his behalf that, though the evidence may show he was guilty of a conspiracy, it does not show that he was a party to the conspiracy charged. Admittedly the evidence shows he is or was a bootlegger. Admittedly it shows he purchased liquor from the rendezvous of the conspirators for resale, but it is submitted on his behalf that this was not enough. The conspiracy, as we have seen, was the unlawful manufacture of intoxicating liquor in Maryland, its transportation to the District of Columbia, and its distribution there through individual bootleggers as well as directly to customers. If there is sufficient evidence in the record to show that Shields knew of the conspiracy and purposely took a part, large or small, in carrying it into effect, he became part and parcel of it. The fact that he may not have been in the conspiracy at its inception, or that he may have taken a minor part, or that he may not have known all of the conspirators, is immaterial, as is also the fact that he may have become a party to it at a later stage of its progress. As was correctly said in Allen v. United States (C. C. A.) 4 F.(2d) 688, 691: "If the parties acted together to accomplish something unlawful, a conspiracy is shown, even though individual conspirators may have done acts in furtherance of the common unlawful design apart from and unknown to the others. All of the conspirators need not be acquainted with each other. They may not have previously associated together. One defendant may know but one other member of the conspiracy. But if, knowing that others have combined to violate the law, a party knowingly co-operates

to further the object of the conspiracy, he becomes a party thereto."

 We must therefore have recourse to the evidence to determine if it is sufficient to sustain the conviction. Among the government witnesses was one Jerry Charteres. He was indicted as one of the conspirators and pleaded guilty, and was used by the government as a witness. He testified that he first met Shields in September, 1929, and that he believed it was at Mendelson's bottle store on Fourteenth street (this was the place from which the bottles and other containers were obtained and much of the liquor distributed), and there is no doubt that Mendelson was one of the moving actors in the conspiracy. At the time Charteres met Shields the former claimed to have just begun the bootlegging business, and about that time he made an arrangement with Shields "whereby they went into a fifty-fifty partnership on the apartment, and the expenses * * * and each would have his own customers," and that this arrangement continued until May, 1930. During this stretch of time Shields was around the apartment "off and on all day long and as late as twelve o'clock at night." The evidence abundantly shows that Charteres was an active member of the group in disposing of the liquor. The next government witness who testified with relation to Shields was Herbert R. Johnson, prohibition agent, who on one occasion saw Shields in Mendelson's store and heard him ask Beasley, another of the defendants and a partner of Mendelson, "to let him have two," and Beasley replied, "All right." On another occasion he saw Shields in Mendelson's store and heard him order two cans of "A." The next reference to Shields occurs in the testimony of one Butts, an employee of the Prohibition Department. The witness had previously gone to Mendelson's store, and, after being properly introduced, had arranged to get half a gallon of alcohol. Thereafter he continued to buy liquor from different members of the conspiracy, and, to bring himself more closely within the range of observation, he told Charteres, Shield's associate and partner, he was out of work, and Charteres promised to see what he could do, and met him a few evenings later and engaged the witness to work for him, as a result of which witness went to Charteres' apartment in Newton street, and "when he arrived there the defendants, Shields and Charteres, were present"; that witness helped Shields and Charteres label bottles with fictitious "Old Schenley Rye" labels; after which he (witness) made approximately eight or ten "deliveries" the same evening and received as compensation $4 from Shields. The next day he was again employed by Charteres and Shields, and on that evening he made approximately eight or ten deliveries and saw Gordon, another of the conspirators, in the apartment; that he observed Mrs. Charteres answering the telephone a number of times, and Shields answering it a few times, and afterwards telling witness where to deliver whisky.

It is quite true there is nothing to connect Shields with the setting up or operation of the still, but that was not within the scope of his activities—his was the sales end of the business and brought him in contact with the distribution rather than the manufacture. He was a bootlegger getting his whisky from Mendelson's place, and the transactions between himself and the latter were of themselves sufficient to sustain an indictment for conspiracy between the two, and, if he knew of Mendelson's part in the general purpose, it is of no consequence that the evidence fails to show he was an original party or had any part in the manufacture or transportation. It does show that he was an instrumentality through which the conspiracy was carried out. He was in daily association with one of the conspirators, Charteres, and this, together with the fact that he was around the place of general rendezvous, got his liquor there, and was one of the conduits through which it found its way into the "bootleg" trade, was enough, we think, to put the question of knowledge and concerted action in furtherance of the conspiracy to the jury. It is not for an appellate court to weigh the evidence and review the decision of the jury on a disputed question of fact. If there is substantial evidence to support the verdict, we have no other duty than to affirm. In the present case the narrative statement of the evidence is, as is too frequently the case, poorly put together, but, as it is, enough appears to show that for nearly six months Shields was associated intimately with one of the conspirators in a common purpose; that, in furtherance of this purpose, he had resort to the source of supply of the contraband manufactured by other of the conspirators, and knowingly aided in its unlawful distribution. The jury were in better position than we are to draw correct inferences from the facts shown and then to judge correctly from these facts and inferences his part in the common enterprise.

Affirmed.