**UNITED STATES v. SPEED et al.**

Cr. No. 73481.

District Court of the United States for the District of Columbia.

June 14, 1948.

Austin F. Canfield, of Washington, D.C., for defendants Speed, Morgan, Moreschi and Hamilton.

Charles E. Ford, of Washington, D.C., for defendant Weiner.

Leo A. Rover, John B. O'Brien, Jr. and J. Frank Cunningham, all of Washington, D.C., for the United States.

HOLTZOFF, Justice.

The defendants Joseph Speed, George Morgan, Faust Moreschi, Evans H. Hamilton and Isaac Weiner, were indicted, together with certain other persons, on a charge of conspiracy to embezzle funds of several component units of The International Hodcarriers Building and Common Laborers' Union. The case was severed in respect to the defendant Larry Kelly, because he disappeared and had not been apprehended. The prosecution abated against the defendant Matthias M. Kiesgen, in view of the fact that he died subsequently to the commencement of the proceeding. The indictment was dismissed by the Government in respect to the defendant Dorothy Kelly. The Court directed a judgment of acquittal in respect to three defendants on the basis of the opening address of Government counsel. A judgment of acquittal was directed in favor of another defendant at the close of the Government's case. The case as to the remaining five defendants above enumerated, was submitted to the jury, which brought in a verdict of guilty as to each of them. They now move for a new trial, or in the alternative for a judgment of acquittal notwithstanding the verdict.

The defendants, Speed, Morgan, Moreschi and Hamilton, occupied official positions in some of the labor organizations involved in this case. The defendant Larry Kelly, who, as stated above, has not been apprehended, was also an official of one of these labor unions and apparently occupied a position of influence and even control and domination.

The uncontradicted evidence shows that the treasury of the labor organizations involved in this case was ruthlessly looted by Kelly with a brazen effrontry equaled only by his unparalleled knavery. As a result of crafty and cunning manipulation, large sums of money were withdrawn from time to time from the treasury of the unions and found their way into Kelly's bank account. Kelly purchased a home for himself, for which he paid, in large part, with money embezzled from these organizations. Considerable construction work was done on this house, as well as on the private homes

of the defendants Morgan and Speed, and was charged to contracts for the erection of a Union Hall. The contractors were paid with union funds. Payments made to some of the defendants, purporting to cover travel or organization expenses, are claimed by the Government to have been flagrant misapplications of money. The most daring and bizarre of the many peculations was the expenditure of approximately $19,000 out of the treasury of one of the unions for the purchase of liquor, most of which was delivered to a night club owned and operated by Kelly. Other lesser defalcations need not be described. In a clumsy effort to conceal these depredations, pages were torn out of checkstub books and telltale cancelled checks were destroyed.

Admittedly Kelly was the key figure in these misdeeds. Most of the misapplied funds went to him. The other defendants are charged with conspiring with him to carry these nefarious transactions into effect. It is also charged that in the course of the conspiracy, the defendants Morgan and Speed obtained pecuniary benefits from its operations, in that construction work on their homes was paid for with union funds. The indictment consists of one count setting forth a single conspiracy to commit the various criminal offenses, some of which have been just enumerated.

■ The defendants contend that the indictment in fact charges and the evidence shows that there were a number of conspiracies and that, therefore, the conviction may not stand. If the indictment charges a single conspiracy and the proof shows several conspiracies, there is a variance. This variance, however, is not fatal unless the defendants have been prejudiced, Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248. There are, therefore, two questions confronting the court on this aspect of the motions: first, whether the proof shows one or several conspiracies; and second, if the proof shows several conspiracies, whether the variance is prejudicial. In the light of the conclusion about to be reached, the second question vanishes. In endeavoring to reach a con-clusion as to whether the evidence tends to show one or several conspiracies, it is desirable to revert to elementary principles.

■ A conspiracy is a combination of two or more persons to accomplish a criminal purpose or purposes by concerted action. In other words, a conspiracy is a partnership in crime. It is created by an agreement to commit a crime or crimes. The existence of the agreement may be established by circumstantial evidence. It may be shown by evidence that the alleged conspirators were acting in concert in accordance with a common design, United States v. Kissel, 218 U.S. 601, 608, 31 S.Ct. 124, 54 L.Ed. 1168; Pinkerton v. United States, 328 U.S. 640, 644, 66 S.Ct. 1180, 90 L.Ed. 1489; Mendelson v. United States, 61 App.D.C. 127, 130, 58 F.2d 532; Chadwick v. United States, 6 Cir., 141 F. 225, 241; Craig v. United States, 9 Cir., 81 F. 2d 816, 822. Various persons may become members of the conspiracy at different times and may play different roles in it. An individual member of the combination need not be aware of all of its ramifications or be cognizant of the number or identity of all of the other participants. If a person knows of its existence and intentionally takes some part in furthering it, he becomes a member of the conspiracy, Mendelson v. United States, supra; Allen v. United States, 7 Cir., 4 F.2d 688, 699. A conspiracy to commit a crime or crimes is separate and distinct from the substantive offenses. A conspiracy may have a number of objectives. "The conspiracy constitutes the offense irrespective of the number or variety of objects which the conspiracy seeks to attain, or whether any of the ultimate objects be attained or not." United States v. Manton, 2 Cir., 107 F.2d 834, 838.

■ The answer to the question whether there is a single conspiracy, therefore, depends on whether there is a single agreement. There may be an undertaking to commit one crime or several crimes. If there is but one agreement, there is but one conspiracy. A test whether the activities of the defendants constitute a single conspiracy is whether there is a common purpose underlying the separate acts, whether the same objective is being pur-

sued in each instance, and whether there is concerted action to achieve this end. It follows hence that the fact that the conspirators undertook to commit several crimes does not necessitate the conclusion that there are several conspiracies. A conspiracy, such as is charged in this case, may be likened to a wheel, with the hub constituting the central figure, the spokes forming its various branches and ramifications, and all being held together by the rim, which represents the agreement.

■ Each case must, of course, be determined on the basis of its own facts. Nevertheless, considerable assistance may be derived from judicial decisions in respect to somewhat analogous situations. In United States v. Manton, 2 Cir., 107 F.2d 834, 838, certiorari denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012, the defendants were convicted on a charge of conspiracy to obstruct the administration of justice and to defraud the United States. Specifically the accusation was that one of the defendants sought out litigants and parties interested in cases pending before the defendant Menton as a judge, and that the latter received sums of money in return for action taken in each of these cases without regard to the merits. It was urged by the defendants that the indictment charged and the evidence tended to show a number of distinct conspiracies, rather than a single conspiracy. It was argued that the allegations in respect to each of the suits set forth a separate and distinct conspiracy. The court, in an opinion written by Mr. Justice Sutherland, sitting as a member of the Circuit Court of Appeals, overruled this contention, saying that it "confuses the conspiracy, which was one, with its aims, which were many" 107 F.2d page 838.[1]

In Lefco v. United States, 3 Cir., 74 F.2d 66, there was a conspiracy to commit a series of frauds. The specific frauds consisted of establishing fraudulent stores conducted in a fraudulent way, in various places. The court held that the jury was justified in finding that there was a single conspiracy.

In United States v. O'Connell, 2 Cir., 165 F.2d 697, a railroad dining car steward was charged with conspiring with the chef and three waiters to collect money from passengers served with meals and convert it, instead of accounting for it to the railroad company. It was urged that the evidence did not establish a single conspiracy between all the defendants, but showed distinct conspiracies each composed of one of the waiters with the steward and the chef. The court held, however, that it was entirely reasonable for the jury to find the existence of a single conspiracy which embraced them all.

The following cases hold to the same effect, Telman v. United States, 10 Cir., 67 F.2d 716; United States v. Beck, 7 Cir., 118 F.2d 178; Oliver v. United States, 10 Cir., 121 F.2d 245; Berenbeim v. United States, 10 Cir., 164 F.2d 679.

■ In the instant case the indictment charges and the proof tends to show a single conspiracy to commit a number of criminal acts. There is a single agreement or a common design to perpetrate numerous embezzlements of funds from several branches of the international union. The fact that the embezzlements were to be committed from different units, instead of from one organization, does not detract from this conclusion. Conspiracies may assume different forms. There may be a single conspiracy to defraud A, and there may also be a single conspiracy to defraud A, B, C, D, and E. In view of the foregoing considerations, the objection that the Government has proved several conspiracies rather than a single conspiracy, is not well founded.

In his capacity as an officer of one of the unions, the defendant Morgan facilitated Kelly in manipulating and embezzling its funds. Moreover, Morgan derived a pecuniary benefit from these reprehensible dealings, in that work done on his home was paid for by union funds. A similar benefit accrued to the defendant Speed. As to the defendant Hamilton, while he did not personally profit, the evidence tends to

---

[1] This case is of considerable importance because of the fact that the Circuit Court of Appeals comprised two members of the Supreme Court, who sat as circuit justices, —Mr. Justice Stone and Mr. Justice Sutherland.

show that he cooperated with Kelly by making a fictitious entry in a minute book in an effort to lend an appearance of regularity to a gross fraud.

It is urged that there is not sufficient evidence to show that the defendant Faust Moreschi was a member of the conspiracy. True, the evidence against him is not as strong as that against his co-defendants. Nevertheless, it appears that he signed two union checks, which were misapplied by Kelly. His explanation was that he had signed them in blank and did not know that they would be used for an improper purpose. It was for the jury, however, to determine whether to believe this explanation or to reject it. In view of the fact that Moreschi's credibility was considerably impeached and shaken on cross-examination, the jury had a right to discard his version of this affair. Another transaction involving Moreschi consisted of a payment by a union organization to him of the sum of $1,000 for expenses of attending a labor convention at Toronto. He admitted that a large part of this money was expended on entertainment in bar rooms and restaurants. He was also paid the sum of $500 for "organization expenses". He admitted that he used the money for a trip to Florida, but claimed that the trip was undertaken for labor union business. The Government contends that in the guise of expenses these funds were actually converted by Moreschi. Questions of fact were thus presented for the decision of the jury. The court finds no reason to interfere with its verdict.

The defendant Weiner is in a somewhat different position from that of the other defendants. Unlike them, he was not an officer or a member of any of the labor organizations. He apparently is a business man in St. Mary's County, Maryland, where one of the unions was operating. Apparently Kelly conceived the idea of building barracks and two restaurants for members of that union, and arranged with the defendant Weiner to undertake this work. The evidence tends to show that Kelly caused union funds to be turned over to Weiner to cover the cost of constructing these buildings. They were erected by Weiner on land owned by him jointly with one Dorothy Bond, who later became Kelly's wife. After constructing these buildings Weiner leased them to the union and collected rent. After the union no longer had any use for these structures, Weiner sold the property as his own and apparently treated the proceeds as belonging to himself. To summarize this transaction, Weiner built the buildings on land of which he was part owner; the cost of construction was borne by the union; the latter paid rent for these buildings to Weiner, who subsequently sold them for his own benefit. The result was that the union received nothing in return for its own investment and even paid rent for the use of buildings which were constructed with its own money. Weiner's transactions with the union were manifestly reprehensible.

The question presented as to Weiner is whether he was a member of the conspiracy charged in the indictment. As stated above, a defendant may enter the ranks of the conspirators subsequently to the inception of the agreement and yet be guilty of conspiracy. Neither is it necessary for him to know all of the conspirators, or be cognizant of all of the ramifications of the illegal combination. It must appear, however, that he knew of the existence of the conspiracy and took some part in furthering it, in order to justify his conviction. "Those having no knowledge of the conspiracy are not conspirators", United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128. Did Weiner know of the existence of the conspiracy and, if so, did he do anything to further it? The indictment charges that the membership of the conspiracy comprized the defendants as well as certain other persons to the grand jury unknown. The proof adduced by the Government at the trial tended to indicate that one of the unidentified conspirators was one Leo Nazdin, who cooperated with Kelly in some of the activities of the latter. Specifically, Leo Nazdin signed some checks by which union funds were transferred to the defendant Weiner for use in the construction of the above-mentioned barracks and restaurants. From this evidence, the jury had a right to infer that the defendant Weiner knew of the existence of the conspiracy, i.e., that Kelly

had conspired with at least one other person, to wit, Leo Nazdin, to misapply union funds. The law does not require that Weiner should have known the names of all of the other conspirators, or be aware of all of the activities and ramifications of the conspiracy. It is sufficient that he knew of its existence. He assisted in furthering it by facilitating the transfer of union funds to himself. Under the circumstances the jury's finding that Weiner was one of the conspirators is supported by substantial evidence, Blumenthal v. United States, 332 U.S. 539, 556, 557, 68 S.Ct. 248, 256. The remarks of the Supreme Court in the Blumenthal case, supra, are applicable to this aspect of the case at bar:

"conspiracies involving such elaborate arrangements generally are not born full grown. Rather they mature by successive stages which are necessary to bring in the essential parties. And not all of those joining in the earlier ones make known their participation to others later coming in.

"The law does not demand proof of so much. For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity."

The foregoing discussion leads to the conclusion that the indictment charges and the proof shows a single conspiracy to which all of the defendants were parties.

Motions for a new trial or in the alternative for a judgment of acquittal notwithstanding the verdict, are denied.