UNITED STATES of America,
Plaintiff-Appellee,

v.

Carlo P. MINIERI and Salvatore Saponaro, Defendants-Appellants.

No. 117, Docket 27071.

United States Court of Appeals
Second Circuit.

Argued Dec. 5, 1961.

Decided May 31, 1962.

Joseph P. Hoey, U. S. Attorney, E.D. N.Y. (Dominick L. DiCarlo, Asst. U. S. Atty., Jerome C. Ditore, Asst. U. S. Atty., of counsel), for plaintiff-appellee.

Louis Kaye, New York City, for defendants-appellants.

Before WATERMAN, SMITH and MARSHALL, Circuit Judges.

WATERMAN, Circuit Judge.

After a jury trial in the United States District Court for the Eastern District of New York, appellants Carlo P. Minieri and Salvatore Saponaro were convicted of possessing goods they knew to have been stolen from a truck while the goods were a part of interstate commerce. 18 U.S.C. § 659 (1958). The jury deliberated twenty-four hours before reporting the verdicts.

The indictment contained two counts, the first that Minieri had the goods in his possession on March 31, 1959, the second that Saponaro possessed them at some time between the day they were stolen, March 12, 1959, and March 31, 1959. At the close of the Government's case and at the close of all the evidence each defendant moved for dismissal of the indictment and for a directed acquittal on the ground that the evidence was insufficient to establish his guilt. The motions were denied and the defendants claim the denials were erroneous.

Both appellants also maintain the trial court committed reversible error when he required the jury, which had received the case in mid-afternoon, to remain locked up overnight in order to resume deliberations in the morning. No objection was made to this procedure at the time.

Appellant Minieri took the stand. He produced eight witnesses who testified to his good reputation, and he claims judicial error in that the charge the trial judge gave the jury as to character and reputation evidence was prejudicially erroneous. No request for a different charge was submitted to the court, and no objection to the charge as given was made.

We hold that there was sufficient evidence against Minieri to require the submission of the case against him to the jury, but that Saponaro's motion to dismiss the indictment as to him should have been granted. A recital of the facts follows.

It was established by uncontradicted evidence that at 4:00 P.M. on March 12, 1959, one hundred forty-four sealed cartons containing approximately fifteen thousand dozen women's undergarments were loaded at Bestform Foundations, Inc., 38–01 47th Avenue, Long Island City, New York, onto a truck owned by an Al's Auto Express; that thereupon the cartons were in interstate commerce; and that when the loading was completed the vehicle was driven to the trucking

company's terminal at 234 West 29th Street in Manhattan where it was parked on the street. At about 12:40 A.M. on the morning of March 13, the night foreman of Al's Auto Express discovered that the truck was gone. On March 14 a police officer found it empty at Van Dam and Meeker Streets in Long Island City.

Alphonse Buttacy, the president of Economy Auto Painting, Inc., whose business premises are located in Long Island City across the street from Bestform Foundations, Inc., and one of his employees, were government witnesses. Buttacy testified that in February 1959 he had rented a section of his basement to an L & M Trucking Company. Buttacy negotiated the lease arrangements with a man named "Mike" whose last name and address were unknown to him. About March 15 he observed a number of cartons in a pile in the part of the basement rented to L & M Trucking Company. The employee testified that on several occasions about the middle of March he saw appellant Minieri's truck parked in the basement, and that on March 27 he saw Minieri loading cartons onto the truck.

Several FBI agents testified to a series of events that occurred on March 30 and 31. At about 8:30 P.M. on March 30 agents observed Minieri's truck arrive and park across the street from Economy Auto Painting. The driver of the truck, whom the agents could not identify from their places of surveillance, went into the Economy shop. While the driver was inside the agents obtained the license number of the truck, and one of them noticed that the name "Minieri" was written on its door. The truck was empty. At about 10:00 P.M. the truck driver and another man emerged from Economy Auto Painting, entered a Pontiac parked in front of that shop and drove away. The Pontiac was followed to the Nassau County line. Another FBI agent testified that at 8:16 the next morning, March 31, an unidentified man entered Minieri's truck, which had remained parked across the street from Economy Auto Painting all night and had been continuously under surveillance, and drove it into the basement of that shop. A half hour later the truck pulled out of the basement and proceeded north on 39th Street toward Queens Boulevard.

It was followed by Federal agents who stopped it at about 9:20 A.M. at Eleventh Avenue and 40th Street in Manhattan near the entrance to the Lincoln Tunnel. Minieri was alone in the cab. He explained to the agents that he was taking freight to New Jersey, but admitted he had no shipping documents. However, he did produce a slip of paper on which was written "Paul's Diner, New Jersey, Route 3, New Jersey." He claimed that this was the address to which he was to deliver the freight. Minieri then consented to the inspection of his truck. It was completely loaded with cartons marked "Bestform," being eighty-one of the one hundred forty-four cartons which had been taken from the Al's Auto Express truck on March 13.

At the agents' request Minieri drove his truck to the New York City office of the Federal Bureau of Investigation. FBI Agent Stewart testified that, after being advised of his rights, Minieri told the agents that early on the morning of March 31 a man known to appellant as Charlie Napoltano telephoned Minieri's wife; that she told Napoltano that her husband could be found at the parking lot on Ninth Street, Long Island City, where he kept his truck; that at approximately 8:00 A.M. Napoltano arrived at the parking lot and offered Minieri thirty dollars to haul a load of goods to New Jersey for him, Napoltano explaining to Minieri that he needed Minieri's services because his own truck had broken down; that Minieri agreed to make the haul for that price; that the two of them then proceeded to 35th Avenue near Ninth Street in Long Island City, where Napoltano's truck was; that Minieri then backed his truck up to the rear of Napoltano's truck, the two men transferred the freight from one truck to the other, and Minieri then headed for New Jersey with Napoltano's load. Agent Stewart further testified that after Minieri had told this tale he

told Minieri that Minieri had been watched driving his truck away from Economy Auto Painting. Minieri thereupon admitted that, contrary to the above story, he had gotten the cartons from the premises of Economy Auto Painting. The excuse he offered for not saying so at first was that he did not wish to involve the owners of Economy Auto Painting. However, he asserted to the agent that his remaining statements made that day were true.

It was the FBI testimony that upon being asked what kind of car he drove Minieri stated he drove a 1951 Pontiac belonging to a used car dealer in Great Neck, Long Island, for whom Minieri worked part time; and that he had left the Pontiac overnight at Economy Auto Painting on the previous night to have some body work done on it. When an agent told Minieri that the car had been seen arriving at the shop early on the morning of March 31, Minieri admitted that he had made a mistake in saying that he left the car overnight, and then explained that Napoltano met him at the auto shop that morning, the two then went to the parking lot where Minieri kept his truck, drove the truck back to Economy Painting, and there loaded it with freight, Minieri having asked Napoltano if the merchandise was stolen merchandise and Napoltano having replied that it was not.

Agent Stewart testified further concerning his conversation at FBI headquarters with Minieri. His testimony was that he had shown Minieri a number of photographs and asked him to identify Napoltano from among them. Minieri pointed out a photograph of a Carmine Santoro as the man he knew as Napoltano. Appellant said he had heard the name Santoro but had always called that man Napoltano because the latter name was written on the truck the man drove. Then Minieri signed a statement setting out his transaction with Napoltano and his identification of the photograph.

Minieri testified in his own behalf at the trial. He stated there that on the morning of March 31 Charlie Napoltano came to Minieri's parking lot and asked him to deliver a load of merchandise to New Jersey because Napoltano's truck had broken down, the two of them then went in two cars, Minieri driving a Pontiac, to Economy Auto Painting, where Minieri saw the freight and agreed to transport it to New Jersey. Then they went back to Minieri's parking lot, got Minieri's truck, returned to the basement of Economy Painting and loaded the freight. He testified he did not know what was in the cartons. He also denied ever identifying the photograph of Carmine Santoro. He claimed, too, that when he was arrested he had an estimate from Economy Auto Painting dated March 31, 1959, for repairs to the Pontiac which he had been driving. The witnesses for the Government, including the used-car dealer Minieri had worked for, contradicted this statement. In addition to his own testimony, Minieri, as we have stated earlier, called eight character witnesses to aid him in his defense.

Having recovered eighty-one of the stolen cartons on the morning of March 31, that afternoon, pursuant to a search warrant, FBI agents searched the section of the basement of Economy Auto Painting which was rented to L & M Trucking Company and found there forty-three cartons of Bestform undergarments, later identified as another part of the shipment taken from Al's Auto Express earlier in the month. Some of the cartons were open, some were closed, but none were empty. The agents also found twelve invoices on the floor of the basement which originally had been packed by Bestform Foundations, Inc. inside several of the cartons found earlier that day in Minieri's truck. On these invoices a government fingerprint expert found six fingerprints and one palmprint of the second appellant in this case, Saponaro. Witnesses for the Government testified that Saponaro could not have handled these invoices before the cartons in which they had been inserted had been removed from the Al's Auto Express truck. Saponaro did not take the stand.

■ On these facts Minieri asserts that he was entitled to a directed verdict of acquittal. He was charged with unlawfully possessing women's undergarments which had been stolen from a truck while the garments were moving in interstate commerce, Minieri knowing these goods to have been so stolen. Thus the elements of the crime with which he was charged were possession of these goods with knowledge that the goods had been stolen. There was undenied evidence of possession. Agent Stewart testified that Minieri was driving the truck in which eighty-one cartons of undergarments were discovered and that no one else was in the truck. An employee of Economy Auto Painting testified that he saw Minieri loading his truck in the basement where forty-three more of the stolen cartons were later found. Minieri did not and could not deny that the cartons were in his truck when he was stopped by the agents. In the absence of a reasonable explanation supporting an innocent possession, a jury is entitled to draw a permissive inference that one who has possession of stolen goods has also the knowledge required to convict him of the crime of possessing the stolen goods knowing the same to have been stolen. "Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence." Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 40 L.Ed. 1090 (1896). United States v. Lefkowitz, 284 F.2d 310 (2 Cir., 1960); United States v. Sherman, 171 F.2d 619, 624 (2 Cir., 1948), cert. denied sub nom. Grimaldi v. United States, 337 U.S. 931, 64 S.Ct. 1484, 93 L.Ed.2d 1738 (1949).

"Such a possession must be accounted for in a straight-forward, truthful way, and unless the jury finds the explanation reasonable and satisfactory, they may be warranted in returning a verdict of guilty. The possession of recently stolen property, without a reasonable explanation of its possession, consistent with innocence, may be considered by the jury as evidence of guilty knowledge of its stolen character, as such possession, under these circumstances, permits an inference to be drawn that the possessor knew it was stolen." Pearson v. United States, 192 F.2d 681, 689–690 (6 Cir., 1951).

Minieri's attempted explanation that he was ignorant of the nature of the goods in his truck was contradicted in several details. He testified that he came to Economy Auto Painting on the morning of March 31 with Charlie Napoltano, left to get his truck, and returned to Economy Painting. Several FBI agents testified that Minieri's truck was parked across the street from Economy Auto Painting from 8:30 P.M., March 30, to 8:16 A.M., March 31. Minieri asserted that he brought his Pontiac to Economy Auto Painting for body work and had an estimate of the work in his pocket when he was arrested. The agent who searched him said Minieri had no such estimate. Agent Stewart stated that Minieri identified a photograph of Carmine Santoro as the man he knew as Charlie Napoltano. At trial Minieri denied making the identification. The testimony of the Economy Auto Painting employee that he saw Minieri on March 27 loading his truck in the basement of that shop tended to refute Minieri's story that he first saw the cartons on the morning of March 31 when Napoltano showed them to him. It was for the jury to decide whom to believe. There was sufficient evidence both of possession and of knowledge to take the case against Minieri to the jury.

■ Minieri also contends that the trial court failed to instruct the jury properly concerning the evidence of his good reputation. The court instructed on this point as follows:

"Your reputation is what other people think about you. Your character is what you really are. It is entirely proper that reputation testimony should be submitted to the

jury; that is to say, what people who know a given person say about his reputation, assuming that they believe what they say; and if you accept that testimony, it may render the task of the Government a heavier one to prove guilt beyond a reasonable doubt, than would be the case if that reputation testimony had not been offered, and had not been found credible. I hope I make that clear."

The defense made no objection to this charge at the trial, but on appeal Minieri asserts that the trial judge should have instructed "that evidence of good character or reputation will ofttimes establish a reasonable doubt as to the guilt of a defendant where otherwise none would exist." Indeed the defense may introduce evidence of the defendant's good reputation to show that it is improbable that he committed the crime charged. Edgington v. United States, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896), 1 Wigmore, Evidence § 56 (3d ed. 1940). And under certain circumstances that testimony alone may raise a reasonable doubt as to the defendant's guilt, and in the federal courts the defendant is entitled to such an instruction. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Edgington v. United States, supra. Although the district judge could have charged with more clarity on this issue, the charge he gave was sufficiently explanatory of the effect reputation testimony has on the prosecution's burden of proof so that in the light of the impressive evidence against Minieri, any shortcoming which the charge might be thought now to have had was neither so obvious nor so prejudicial to the substantial rights of the defendant that it is our duty to excuse the failure timely to object at the time the instruction was given. See Fed.R. Crim.Proc. 30, 52(b), 18 U.S.C. United States v. Sansone, 231 F.2d 887, 891 (2 Cir.), cert. denied 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956); United States v. O'Connor, 237 F.2d 466, 472 (2 Cir., 1956); United States v. Campisi, 292 F.2d 811 (2 Cir., 1961), cert. denied

368 U.S. 958, 82 S.Ct. 401, 7 L.Ed.2d 389 (1962); United States v. Frascone, 299 F.2d 824 (2 Cir., 1962).

Thirdly, Minieri argues that there was no evidence from which the jury could properly have found that the goods taken from his truck were ever stolen. But this is not so. There was evidence that a truck containing cartons of Bestform undergarments was missing at 12:40 A.M., March 13, 1959. The truck was found empty the next day several miles away. Part of the merchandise which had been in that truck before it was moved was found seventeen days later in appellant's truck, and more of the missing shipment was found in the basement of Economy Auto Painting where appellant's truck had been loaded. This evidence was quite sufficient to support a finding that the goods in Minieri's truck had been stolen. The circumstances of the present case are very similar to those in United States v. Danzo, 164 F.2d 200 (2 Cir., 1947) (per curiam). In that case goods were packed in a carton and delivered to a pier on the North River, there to be transported by railroad to Amarillo, Texas. Instead of being put on the railroad, the carton was found one week later in an automobile in which the appellants were riding. This court held that on those facts there was sufficient evidence of the theft to satisfy the requirements of the very statute Minieri is accused of having violated, and the convictions in Danzo were affirmed. The circumstantial evidence of theft present here is every bit as impressive as that brought out by the Government in Danzo.

Finally, Minieri contends that the trial judge coerced the jury by offering at 12:00 midnight, after they had deliberated for nine hours, to seclude them for the night so that they could resume their deliberations the next day. There is no merit to the contention. The conversation between the judge and the jury foreman which the appellant claims is coercive was as follows:

"The Court: It is now just 12:00 midnight, and I have a note saying

that the jury feels that it cannot arrive at a verdict tonight. Signed, 'W. Henry.'

"Does that mean that you would like to be locked up for the night and resume your deliberations in the morning? Is that what the note means?

"The Foreman: Well, that is up to the majority.

"The Court: Well, then, of course, your wishes will be acceded to."

The period for which the jury is to be kept together is in the discretion of the trial judge. United States v. Novick, 124 F.2d 107 (2 Cir., 1941), cert. denied 315 U.S. 813, 62 S.Ct. 795, 86 L.Ed. 1212 (1942); Mendelson v. United States, 61 App.D.C. 127, 58 F.2d 532, 535 (1932); Bernal v. United States, 241 F. 339 (5 Cir., 1917), cert. denied 245 U.S. 672, 38 S.Ct. 192, 62 L.Ed. 540 (1918). Cf. Allis v. United States, 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91 (1894). In United States v. Olweiss, 138 F.2d 798, 800–801 (2 Cir., 1943), motion to file petition for certiorari denied, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944), the jury returned after two hours of deliberation and announced that it was hopelessly divided. This court found no coercion on the part of the trial judge when he sent the jurors back for further deliberation, saying to them, "You may also have all day tomorrow and the next day if you want it." In United States v. Commerford, 64 F.2d 28 (2 Cir.), cert. denied 289 U.S. 759, 53 S.Ct. 792, 77 L.Ed. 1502 (1933), after the jury had deliberated for seven hours, the judge recalled them and said:

"I have called you in, gentlemen, to tell you that I think you ought to make every possible effort to come to an agreement at least upon some of the charges, one or more, and to make all the progress you can towards that end. In the event that you can not, it will be necessary that you be taken up to the hotel for the evening, and resume your deliberations in the morning.

"I do not want to in any way exercise the slightest bit of compulsion on you, I do not do that, but I do urge you to try to come to an agreement among yourselves.

"As I said, it may be possible to agree upon some parts of the case, although not on all; that is done and it is not infrequent.

"With that further statement to you, I will excuse you and you may resume your deliberations." 64 F.2d at 30–31

On appeal this was held not to be coercive but, instead, was held to be a fair and considerate instruction. The language used by the trial judge in addressing the jury in the present case was no more coercive than the language used by the judges in Olweiss and Commerford.

Therefore, we affirm the conviction of Carlo P. Minieri.

Turning to the evidence against Saponaro we discover it to be quite different from that which supports Minieri's conviction. The only evidence against Saponaro was the testimony that his fingerprints were found on invoices which at one time were enclosed in the stolen cartons, plus supporting testimony that he could not have handled the invoices before the theft.

■■ To convict Saponaro of the substantive crime of which he was charged the Government had to prove that he had had possession of the stolen goods. In the recent case of United States v. Lefkowitz, 284 F.2d 310, 315 (2 Cir.,1960), a panel of this court held that evidence of the accused's fingerprints found on certain cartons of merchandise which had been stolen, added to evidence that the accused could not have handled the cartons before the theft, was not sufficient evidence to permit the jury to find that the defendant ever had had possession of the stolen cartons. "Mere touching is not possession." Id. at 315. In the case before us there is no evidence that Saponaro even touched the cartons. His fingerprints were not on the cartons but on invoices found on the basement floor. As

the touching of the cartons in Lefkowitz was not enough evidence to show possession of the cartons, so the handling of the invoices in this case was not enough evidence to permit the jury to find that Saponaro had ever had possession of the cartons. The invoices might have originally been inside the cartons that were of the shipment which was stolen, but the invoices were not the goods for the illegal possession of which the defendant was on trial. The circumstantial fingerprint evidence in this case is as consistent with the possibility that Saponaro innocently picked up the invoices from the floor after someone else had taken them out of the cartons as it is with the possibility that he took the invoices out of the cartons.

The Government, however, asserts on appeal that an actual possession of the stolen goods by Saponaro is not required in order to affirm his conviction, for it is argued that if the requisite scienter is present Saponaro can be convicted as an aider and abbettor under 18 U.S.C. § 2 (1958), and thereunder may receive the same punishment as if he had had actual possession of the stolen cartons.

Although the judge below charged the jury that they must find possession on Saponaro's part to convict him, and said nothing about the possibility of convicting him as an aider and abbettor, we could affirm Saponaro's conviction below if there were evidence that he aided and abetted someone else's illegal posesssion of the stolen goods. United States v. Rappy, 157 F.2d 964 (2 Cir., 1946), cert. denied, 329 U.S. 806, 67 S.Ct. 501, 91 L.Ed. 688 (1947). In United States v. Lefkowitz, supra, the fact that the accused's fingerprints were on the cartons was held sufficient evidence to create a jury question whether the defendant handled the cartons and thereby assisted someone in possessing the stolen merchandise. But in the present case there only was evidence that Saponaro touched invoices which were not found with the cartons invoiced. Evidence that a person was present where an illegal act occurred is not sufficient evidence, without more, to convict him of aiding and abetting that unlawful act. United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951); United States v. Carengella, 198 F.2d 3 (7 Cir.), cert. denied, 344 U.S. 881, 73 S.Ct. 179, 97 L.Ed. 682 (1952). United States v. Wiley, 267 F.2d 453, 454 (7 Cir., 1959) (dictum). Therefore, unlike the situation in Rappy, insufficient evidence was introduced in this trial for one justifiably to find that Saponaro aided and abetted the illegal possession of the stolen goods.

Therefore, though the conviction of Minieri is affirmed the conviction of Saponaro is reversed and the case is remanded with instructions to dismiss the indictment against him.