Jamontie M. COLLINS, Appellant,

v.

UNITED STATES, Appellee.

No. 11–CF–949.

District of Columbia Court of Appeals.

Argued May 23, 2013.

Decided Aug. 15, 2013.

Stefanie Schneider, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Peter S. Smith, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman and Edward O'Connell, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and FISHER, Associate Judges, and SCHWELB, Senior Judge.

FISHER, Associate Judge:

Appellant Jamontie Collins challenges his convictions arising from assaults of two victims and the robbery of one of them, claiming that the trial court committed reversible error by instructing the jury that he could be held vicariously liable for the conduct of co-conspirators. He also

argues that the evidence is insufficient to support certain of his convictions. We affirm the judgment except for one count of assault with significant bodily injury, which merges into the conviction for aggravated assault of the same victim.

## I. Background

### A. The Attack at the Red Roof Inn

Appellant's convictions arose from an attack that occurred shortly after midnight on Saturday, March 20, 2010. Many of the events were captured by security cameras mounted outside a Red Roof Inn.

Around midnight, William Wooten and Richard Brown, then aged twenty-four and eighteen, respectively, were walking eastbound on H Street towards the intersection with Fifth Street in Northwest Washington, D.C. At that time, several young men, including appellant, were loitering in front of the Red Roof Inn, walking back and forth and talking to each other. The various young men were identified throughout the proceedings that followed by their appearance, including descriptions of their clothing. For example, one young man wore a checkered shirt, another wore a red shirt and a red baseball cap, and a third wore a white hooded sweatshirt with stripes on the sleeves. Two other young men—one in a tan-colored, long-sleeved jacket with a dark stripe, and another in a black t-shirt, cap, and jeans—leaned against vehicles outside the hotel entrance.

As Wooten and Brown walked side-by-side towards the Red Roof Inn, they encountered a young boy who they estimated was about ten or eleven years old. The boy asked where they were from and what they had in their pockets, leading Wooten and Brown to suspect that "a set up" or a plan to rob them was afoot. Wooten testified that he responded "Virginia," but did not reply to the second question, and that he and Brown continued walking. Brown recalled Wooten saying " 'money' or something like that" in response to the second question. Wooten and Brown noted that appellant was standing near the wall by the hotel entrance at the time, roughly a foot away from the little boy.

Suddenly, appellant attacked Wooten from behind, punching him in the eye. Wooten and appellant struggled, throwing punches. As Wooten began to get the upper hand, appellant called to his associates for assistance, saying, "Oh, y'all just going to stand there?" Within seconds, several young men—including a man wearing a two-toned jacket (white with colored shoulders and sleeves)—joined appellant. Wooten estimated that seven or eight young men surrounded him during the fight. Appellant and others slammed Wooten against a car, and the impact from Wooten's elbow shattered one of the car's windows, lodging shards of glass in his arm as the young men continued to pummel him.

Brown moved away as the fight began, but quickly drew closer to Wooten and his assailants. As Brown approached, the man in the checkered shirt pointed to him, and some of the other young men yelled to each other, "Back off. Back off," while another yelled, "Oh, he's got a blade on him," apparently seeing that Brown had pulled out a knife.

Wooten continued to fight back, and with the men temporarily distracted by Brown's advance, Wooten managed to remove his arm from the car window. He then pulled out a small knife, advancing on appellant. This caused appellant and the others to scatter; while Wooten pursued appellant, the man in the two-toned jacket turned his attention to Brown. In the middle of H Street, in front of the Red Roof Inn, the man in the two-toned jacket told Brown to empty his pockets, which Brown refused to do.

At the same time that the man in the two-toned jacket was confronting Brown, Wooten managed to stab appellant's leg and cut his face with a knife. Appellant yelled, "Get the gun. Get the gun." Seconds later, a young man in a black, long-sleeved Northface jacket and blue jeans chased Wooten from the middle of H Street towards the hotel, repeatedly firing a semi-automatic handgun at Wooten as they ran south on Fifth Street.

Although Wooten had not seen the gunman participate in the fight before he began shooting, Brown heard the man in the two-toned jacket—the same man who had ordered him to empty his pockets—ask the gunman by name (a name that Brown did not recall) for assistance in robbing Brown. Ten seconds later, Brown heard gunshots. Wooten fled southward on Fifth Street, where a security guard at a nearby federal building called the police.

Brown ran north on Fifth Street, where he saw the gunman pass him, running in the same direction on the other side of the street. About half a block north of the Red Roof Inn and approximately twenty to twenty-five seconds after shots were fired, two men caught up to Brown. They pinned Brown to a car and punched him twice—once in the face—breaking his jaw and blurring his vision. Brown managed to block the other blow with his wrist.

Brown identified the man who threw the first punch as the same man who had told him to empty his pockets in front of the Red Roof Inn—the man in the two-toned jacket. He could not discern who delivered the second blow. The men robbed Brown of his wallet and cell phone, and fled north on Fifth Street. When the men fled, Brown headed back towards the Red Roof Inn to find Wooten, and he spoke

with police officers who had responded to the scene of the shooting.

Within a minute or two of the shooting, Metropolitan Police Department Officer Rodney Anderson saw three young men whom he recognized from the Sursum Corda neighborhood.[1] One wore a red baseball cap and a red shirt; another had a black hat, a black jacket, and short hair; a third, who had dreadlocks, was wearing a blue and white shirt. The men were running away from the area of the shooting on Fifth Street, going northwards at the 500 block of I Street, while Officer Anderson was driving westbound on I Street. Officer Anderson did not stop them, instead driving towards the Sursum Corda neighborhood to respond to a radio call from an officer who was pursuing a suspect from the Red Roof Inn shooting. Approximately two minutes later, Officer Anderson saw the same men running east on K Street at New Jersey Avenue towards the Sursum Corda neighborhood. He stopped and frisked the men, who said they were running because they had heard there was a shooting at 5th and H Streets. Finding no weapons, Officer Anderson let the men go. At trial, Officer Anderson identified the young man wearing black, Rachant Baker, as the gunman shown in the Red Roof Inn security camera footage.

Officer Anderson continued on M Street between North Capitol and First Streets, where he saw another group of "several" men walking east. Officer Anderson described three of the men in the group—appellant, whom Officer Anderson identified as a dark-complected young black male in his twenties, wearing a black jacket and dark blue jeans; a "little kid," who Officer Anderson estimated to be about twelve years old; and the same young man

1. Officer Anderson explained that Sursum Corda is a neighborhood "right along North Capitol Street, bordered by North Capitol and First Street, New York Avenue and K Street" in Northwest Washington.

wearing a red cap and a red shirt whom he had seen with the other group.

The group changed direction upon seeing Officer Anderson's police cruiser, and went into a parking lot behind the Tyler House apartment complex at 1200 North Capitol Street. Officer Anderson did not have a chance to stop the group, although, some ten minutes later, he saw appellant again as he and other officers responded to a 9–1–1 call from Tyler House reporting a stabbing. Appellant was the person who had been stabbed. At trial, Officer Anderson watched the video footage of the initial assault outside the Red Roof Inn and identified all of the young men he had testified about having seen at various points that night.

From Tyler House, appellant was taken to Medstar Washington Hospital Center where he was treated for knife wounds to the leg and face. Upon being informed that he was being arrested for the crime of armed robbery, appellant spontaneously stated, "It's not a robbery though. I prefer it being an assault, or something like that. It's not a robbery though."

After the shooting, Wooten was taken to Howard University Hospital, where he was treated for injuries including facial cuts, bruising near his eye, and a graze wound to his left thigh from one of the gunman's bullets. The lacerations to his arm from the glass shards required seven stitches, which were removed approximately a month later and caused scarring that Wooten displayed to the jury. Brown had a broken jaw, which required surgery. His jaw was wired shut for eight weeks, inhibiting his ability to eat and speak, and causing pain that required medication.

### B. The Proceedings

The case went to trial on February 3, 2011, before the Honorable Ronna L. Beck. The jury acquitted appellant of assault with intent to kill William Wooten while armed ("AWIKWA," D.C.Code §§ 22–401, –4502 (2001)), but convicted him of the lesser-included offense of assault with a dangerous weapon (D.C.Code § 22–402 (2001)) and the accompanying charge of possession of a firearm during a crime of violence ("PFCV," D.C.Code § 22–4504(b) (2001)). These charges, which were based upon the gunman's shooting at Wooten, were presented to the jury on both a conspiracy theory of liability under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and an aiding and abetting theory. The jury also convicted appellant of assaulting Wooten with intent to rob ("AWIR," D.C.Code § 22–401 (2001)) and a related PFCV charge, as well as assault with significant bodily injury ("ASBI," D.C.Code § 22–404(a)(2) (2001)). The AWIR and ASBI charges proceeded on a theory of direct liability,[2] while the PFCV charge predicated upon the AWIR count proceeded only on a conspiracy theory. With respect to the offenses against Richard Brown, the jury convicted appellant of robbery (D.C.Code § 22–2801 (2001)), aggravated assault (D.C.Code § 22–404.01 (2009 Supp.)), and ASBI, which were presented on both conspiracy and aiding and abetting theories, as well as AWIR while armed and a related PFCV charge, which were based only on a conspiracy theory of liability.

### II. Analysis

Appellant asserts that it was error to instruct the jury on a conspiracy theory of

---

2. Of the convictions related to Wooten, appellant only challenges the PFCV conviction predicated upon AWIR. He does not challenge the convictions for ADW, the associated PFCV charge, AWIR, and ASBI of Wooten.

liability. He also claims that there was insufficient evidence to convict him of offenses against Brown on either an aiding and abetting theory of liability or a conspiracy theory. Concluding that there was sufficient evidence to convict him under a conspiracy theory of liability, we do not address appellant's aiding and abetting challenge.

## A. *Pinkerton* Liability

■ Several of the charges against appellant were presented to the jury on a conspiracy (or *Pinkerton* ) theory of liability. "As articulated by this court, the *Pinkerton* doctrine provides that a co-conspirator who does not directly commit a substantive offense may [nevertheless] be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement." *Wilson–Bey v. United States*, 903 A.2d 818, 840 (D.C. 2006) (en banc) (internal quotation marks omitted) (alteration in original).

Appellant claims that the trial court erred in two ways by instructing on such a theory. First, he invokes the Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (jury must determine beyond a reasonable doubt any facts other than prior convictions that increase penalty beyond statutory maximum) and *United States v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (facts that increase punishment beyond the statutory maximum must be included in indictment), arguing that we may no longer countenance convictions based on a conspiracy theory of liability where the government "made no mention of the essential elements sustaining co-conspirator liability" in the indictment. Second, he asserts that there was insufficient evidence of a conspiracy to permit a *Pinkerton* instruction.

### 1. Failure to Allege Elements of Conspiracy Liability in the Indictment

■ Because appellant neglected to raise this issue before the trial court, we review for plain error, reversing only where he can show that "(1) there is error, (2) the error is plain, meaning 'clear' or 'obvious,' ... (3) the error affected [his] substantial rights[,] [and (4) ] the error seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Baker v. United States*, 867 A.2d 988, 1002 (D.C.2005) (internal citations and quotation marks omitted).

■ Appellant cannot make a showing of error given our case law, much less error that was "clear" or "obvious." In *Thomas v. United States*, 748 A.2d 931 (D.C.2000), we held that the government did not have to charge conspiracy in the indictment in order to proceed on a conspiracy theory of liability at trial. There we stated: "In explaining the rationale for not requiring a formal conspiracy charge as a predicate for the *Pinkerton* theory, courts have reasoned that '[i]ndictments do not recite the government's theory of proof, which is what the *Pinkerton* theory is.'" *Id.* at 935 (quoting *United States v. Edmond*, 924 F.2d 261, 269 (D.C.Cir.1991)) (alteration in original); *see also United States v. Washington*, 106 F.3d 983, 1011 (D.C.Cir.1997) ("Contrary to appellants' view that co-conspirators may be held liable only for the overt acts of their co-conspirators specifically alleged in the indictment, a theory of defendant liability need not be pleaded in the indictment.").

More recently, in *Baker*, we rejected an argument essentially identical to appellant's—that *Apprendi* and *Cotton* compelled a change in our law:

> Appellant argues that because a *Pinkerton* instruction provides a jury with an alternative definition of the crime, it

functions effectively like an element of the offense and therefore must be indicted. However, we reasoned in *Thomas* that a theory of liability such as the conspiratorial theory argued by the government here is not equal to an element of a crime that must be charged in the indictment. We also note here that a *Pinkerton* theory of conspiratorial liability does not increase the penalty for any charged crime beyond its statutory maximum, because *Pinkerton* liability is a basis for a conviction not a sentencing enhancement factor. We are not satisfied that the Supreme Court holdings [in cases including *Apprendi* and *Cotton*] are sufficiently on point to justify our disregard of a square holding of this court binding upon us as a panel.

*Baker*, 867 A.2d at 1005 (internal citations omitted).

 While appellant is right to say that our recent cases have distinguished between the showings necessary to establish conspiracy and aiding and abetting liability, *see Wilson–Bey*, 903 A.2d at 839 ("*Pinkerton* liability and aiding and abetting liability are distinct legal theories and require proof of different elements."), he incorrectly claims that those distinctions undercut our reasoning in *Thomas* and *Baker*.[3] In this context, both *Pinkerton* and aiding and abetting are theories of liability, rather than substantive offenses. Accordingly, our reasoning in *Baker* that a

"theory of liability ... is not equal to an element of a crime that must be charged in the indictment" stands. 867 A.2d at 1005. As a panel of this court, we are bound to follow this precedent. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971) (one panel of the court may not overturn the decision of a previous panel).

### 2. The Factual Predicate for *Pinkerton* Liability

 Although two questions remain— whether the evidence permitted a *Pinkerton* instruction and whether it was sufficient to support appellant's convictions based on a conspiracy theory of liability— both depend on the same evidence, and we consider them in tandem. We review the trial court's decision to issue a jury instruction for abuse of discretion, determining whether it represents "an adequate statement of the law, and whether it is supported by evidence in the case." *(Anthony) Wheeler v. United States*, 930 A.2d 232, 238 (D.C.2007). "In evaluating the sufficiency of the evidence to support guilt on a conspiracy theory ... we evaluate the sufficiency of the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact...." *Snowden v. United States*, 52 A.3d 858, 864 n. 14 (D.C.2012) (internal quotation marks omitted) (alteration in original).[4]

---

3. In *Wilson–Bey*, we held that the government was required to show that the accomplice had the same intent necessary to prove commission of the underlying substantive offense by the principal. 903 A.2d at 840; *see also Kitt v. United States*, 904 A.2d 348, 356 (D.C.2006) ("[W]here a specific *mens rea* is an element of a criminal offense, a defendant must have had that *mens rea* himself to be guilty of that offense, whether he is charged as the principal actor or as an aider and abettor."). However, we underscored that this holding "does not apply to ... conspiracy, ... which the

law treats differently." *Wilson–Bey*, 903 A.2d at 837 n. 33.

4. The security camera footage allows us to visualize the events at the Red Roof Inn in a way that would not be possible based on witness testimony alone. Nonetheless, we do not become finders of fact, nor does the availability of such footage change our standard of review. We view the footage—as we do all the evidence—in the light most favorable to the government, and to determine whether any rational fact-finder could be convinced of appellant's guilt beyond a reasonable doubt.

■ To establish liability for the acts of co-conspirators, the government had to demonstrate "that an agreement existed, that a substantive crime was committed by a co-conspirator in furtherance of that agreement, and that the substantive crime was a reasonably foreseeable consequence of the agreement between the conspirators." *Wilson–Bey v. United States*, 903 A.2d at 840 (citing *Pinkerton*, 328 U.S. at 646–47, 66 S.Ct. 1180). Appellant focuses on the agreement element, claiming that there was insufficient evidence to show (1) that there was an agreement to rob either Wooten or Brown, or (2) that the perpetrators who robbed Brown were parties to any agreement that included appellant. In particular, appellant insists the video evidence depicts a "chaotic" scene, characterized by "spontaneous[ ]" and "opportunist[ic]" action, rather than concerted effort.

■ Examining the circumstances in the light most favorable to the government, we are satisfied that there was sufficient evidence from which the jury could infer the existence of an agreement to rob Wooten and Brown. A conspiracy is rarely established through direct evidence, due to the very nature of the crime. *(Harry) Wheeler v. United States*, 977 A.2d 973, 982 n. 19 (D.C.2009) ("[T]he evidence supporting a conspiracy conviction nearly al-

ways is circumstantial because '[t]here is rarely in a conspiracy case direct evidence of the conspiracy or proof of declarations.' ") (quoting *McNeil v. United States*, 85 F.2d 698, 703 (D.C.Cir.1936)) (second alteration in original). Accordingly, "[a] jury may infer the existence of an agreement from the participants' actions," *Lucas v. United States*, 20 A.3d 737, 744 (D.C.2011), "includ[ing] the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties and the interests of the alleged conspirators," *Campos–Alvarez v. United States*, 16 A.3d 954, 965 (D.C.2011) (internal quotation marks omitted).

■ There was ample evidence that the participants in the attack on Wooten and the robbery of Brown were not merely, as appellant claims, "a group from the neighborhood comprised largely of friends of friends and acquaintances tagging along, as teenagers tend to do,"[5] but were instead working in concert to rob Wooten and Brown. The jury could reasonably infer a plan to rob from the boy's inquiry about the contents of the victims' pockets. *See Carter v. United States*, 957 A.2d 9, 15 (D.C.2008) ("It is well established that the jury may infer the intent to rob from the totality of the evidence.") (internal quota-

---

5. While evidence of affiliation or "mere association" cannot, by itself, support an inference of a conspiratorial agreement, it may nonetheless be relevant. *See, e.g., Campos–Alvarez v. United States*, 16 A.3d 954, 965 (D.C.2011) ("the relationship of the parties" is a relevant factor to consider in inferring existence of agreement); *United States v. Wardell*, 591 F.3d 1279, 1287–88 (10th Cir.2009) (same); *United States v. Navarrete*, 125 F.3d 559, 562 (7th Cir.1997) ("[T]he government can prove that a defendant joined a conspiracy if his presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy is shown.") (internal quotation marks omitted); *United States v. Flores–Rivera*, 56 F.3d

319, 324 (1st Cir.1995) ("Mere presence at the scene and close association with those involved are insufficient factors alone; nevertheless, they are *relevant* factors for the jury."); *United States v. Natel*, 812 F.2d 937, 940–41 (5th Cir.1987) (same). For example, Officer Anderson saw several group members traveling together in various configurations shortly after the shooting—he stopped and frisked a group including the gunman and the young man in the red cap and red shirt, and minutes later, the same young man in red was running in another group with appellant and the young boy. This evidence shows close association before, during, and after the crime and supports an inference that an agreement existed.

tion marks omitted); *cf. also Abdus–Price v. United States*, 873 A.2d 326, 333 n. 8 (D.C.2005) (sufficient evidence to infer intent to rob even where no verbal demand was made and no property was stolen). The boy's close proximity to appellant prior to the assault, his presence throughout the altercation in front of the Red Roof Inn, and his continued presence when Officer Anderson encountered appellant on M Street after the attack suggest both a close relationship and coordinated action.

This evidence of coordination was by no means confined to appellant and the young boy. Five of the young men who remained throughout the altercation, appeared to be loitering with purpose in front of the hotel prior to the attack. Upon seeing Brown pull out a knife, some of these same group members called a warning to "back off," and the man in the checkered shirt pointed at Brown. Furthermore, both appellant and the man in the two-toned jacket called for assistance from the gunman, which suggests not only a close relationship to, but also reliance upon, the gunman in executing a planned attack. *See, e.g., McCoy v. United States*, 890 A.2d 204, 214 (D.C. 2006) ("That one occupant of the Volvo drove while the other fired gunshots and shouted instructions is enough to infer an agreement and knowing participation in the ADW."). All these actions indicate both group cohesion and coordination in a pre-existing plan to commit robbery.

■■■■ It was not necessary for the government to prove that the group members had targeted Wooten and Brown specifically upon forming the conspiracy to commit robbery. "The formation of a conspiracy to rob does not necessarily require agreement either as to the means of committing the robbery, or as to the particular person to be robbed." *Bruce v. United States*, 379 F.2d 113, 118 n. 14 (D.C.Cir. 1967). Indeed, conspirators may leave room for improvisation or refinement of

details so long as they have agreed upon their fundamental goal. *See United States v. Gatling*, 96 F.3d 1511, 1518 (D.C.Cir. 1996) ("In order to prove that an agreement existed, the government need only show that the conspirators agreed on the essential nature of the plan, not that they agreed on the details of their criminal scheme.") (internal quotation marks omitted). Here, Wooten and Brown may have been targets of opportunity who came along at an inopportune time (for them). But we have recognized that the formation of a conspiratorial agreement may be "near-instant," *Lucas*, 20 A.3d at 744, and the same principle applies to the refinement of details. Thus, the jury was free to infer that a conspiracy to rob Wooten and Brown developed, even if the details of the plan did not appear to be carefully choreographed from the outset or were refined within moments of the attack.

■■■■ Appellant also claims that even if a conspiracy did exist, there was not enough evidence to prove that the men who robbed Brown were part of it. However, the testimony and video evidence suggest otherwise. The jury could reasonably infer that the man in the two-toned jacket was an active member of the group from the outset, given his apparent proximity prior to the altercation, his quick response to appellant's call for assistance, and his presence throughout the rest of the fight. In fewer than five seconds after appellant's call for assistance from the group, the man in the two-toned jacket and another man ran into the view of the security camera. There, the man in the two-toned jacket joined other members of the group in backing up appellant and the other young men pummeling Wooten. It was not until Wooten finally managed to turn the tide against appellant, and the rest of the men had scattered, that the man in the two-toned jacket turned to

robbing Brown, who had escaped the brunt of the group's attention to that point.

While the rest of the group scattered as the attack on Wooten appeared to be a losing battle, the man in the two-toned jacket commenced an attack on Wooten's companion. The fact that this first attempt to rob Brown occurred at the same location and contemporaneously with appellant's assault upon Wooten also indicates the existence of a common scheme, even though the man in the two-toned jacket was unable to complete the robbery until he reached Fifth Street. *Cf. West v. United States*, 499 A.2d 860, 866 (D.C. 1985) (in context of aiding and abetting liability, "[a] jury could reasonably have concluded that there existed a joint scheme to rob the truck's occupants, including Brown, and that the fatal shot, which was fired within minutes after the robbery had commenced, was a natural and probable consequence of the attempted robbery, and not merely coincidental in time and place to the robbery," where "[a]ppellants approached the victims as a group," remained in close proximity to the victims, and demanded money and searched them).

■■■ The evidence thus permitted the jury to conclude that the man in the two-toned jacket was a part of the conspiracy before the attack began. But even if he was a relative "latecomer," this would not negate *Pinkerton* liability for appellant based on the man's actions. "[A] conspirator can join a conspiracy at any time and need not have been involved at its inception." *Castillo–Campos v. United States*, 987 A.2d 476, 484 (D.C.2010). The "jury could find that [the latecomer] participated in a conspiracy from the moment he knowingly joined in an effort" to achieve the common criminal plan. *Id.; see also Mendelson v. United States*, 58 F.2d 532, 535 (D.C.Cir.1932) (affirming bootlegging conviction based on conspiracy theory of liability and noting, "If there is sufficient evidence in the record to show that [the latecomer co-conspirator] knew of the conspiracy and purposely took a part, large or small, in carrying it into effect, he became part and parcel of it. The fact that he may not have been in the conspiracy at its inception, or that he may have taken a minor part, or that he may not have known all of the conspirators, is immaterial, as is also the fact that he may have become a party to it at a later stage of its progress.").

Once it was established that appellant and the man in the two-toned jacket were co-conspirators, the standard rules of conspiracy liability applied. *Pinkerton* liability encompasses an act that was "committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement." *Snowden*, 52 A.3d at 863 (internal quotation marks omitted); *accord, United States v. Saro*, 24 F.3d 283, 288 (D.C.Cir.1994) (It is a "well-settled principle of conspiracy law that someone who jointly undertakes a criminal activity with others is accountable for their reasonably foreseeable conduct in furtherance of the joint undertaking."). It is enough that the jury could infer that the man in the two-toned jacket had joined the conspiracy, and, as the trial court's instructions required,[6] that his actions thereafter were reasonably foreseeable and in furtherance of the conspiracy to rob. Whether appellant knew who perpetrated the robbery of Brown, or how, when, or where they did so, is

---

6. The trial court's general instruction on conspiracy liability stated: "It is not necessary to find that the crime was intended as a part of the original plan, only that it was a foresee-able consequence of the original plan." Appellant does not challenge the wording of this instruction.

immaterial; he could foresee that his associates would come to his aid when he called for assistance, and that they would continue to pursue the common purpose by robbing Brown, who was walking side-by-side with Wooten when appellant launched the attack. *See Mendelson,* 58 F.2d at 535 ("If the parties acted together to accomplish something unlawful, a conspiracy is shown, even though individual conspirators may have done acts in furtherance of the common unlawful design apart from and unknown to the others.").

Ultimately, appellant fails to view the evidence in the light most favorable to the government, as is required by our standard of review. While the question of whether an agreement existed may have been a close one at trial, to survive our scrutiny on appeal "[t]he evidence need not 'compel a finding of guilt beyond a reasonable doubt ... [nor] negate every possible inference of innocence.'" *Napper v. United States,* 22 A.3d 758, 770 (D.C.2011) (quoting *Timberlake v. United States,* 758 A.2d 978, 980 (D.C.2000)). We are not prepared to say that no rational fact-finder could infer an agreement beyond a reasonable doubt, and we will not substitute our judgment for that of the jury.

### B. Merger

The government concedes that appellant's conviction for ASBI of Brown merges with his conviction for aggravated assault of Brown because ASBI is a lesser-included offense of aggravated assault. *See (Marcel) Jackson v. United States,* 970 A.2d 277, 279 (D.C.2009) (aggravated assault requires proof of "serious bodily injury"); *In re R.S.,* 6 A.3d 854, 859 (D.C.2010) ("[T]he threshold for significant bodily injury is markedly less severe than that required for aggravated assault."); *(David) Jackson v. United States,* 940 A.2d 981, 986–87 (D.C.2008) (explaining that amendment to assault statute created an "intermediate" assault offense requiring proof of "significant bodily injury" to "fill the gap between aggravated assault and simple assault"). Accordingly, we remand for the trial court to vacate appellant's conviction and sentence for assault with significant bodily injury. Resentencing is not required, as appellant's sentences for these counts are concurrent and congruent. *See United States v. Battle,* 613 F.3d 258, 266 (D.C.Cir.2010) ("Because the court sentenced [appellant] to the same, concurrent terms of imprisonment for [both] convictions, resentencing is unnecessary.").

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court, and remand for the limited purpose of vacating appellant's conviction and sentence for the assault of Brown with significant bodily injury.

*It is so ordered.*