# District of Columbia
# Court of Appeals

**Nos. 14-CF-565, 14-CF-625 & 14-CF-638**

RAYSHAWN CLARK, DWAYNE HILTON and
     PERNELL LEE,

Appellants,

v.

UNITED STATES,

Appellee.



FILED

OCT - 6 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

**CF3-10591-12;
CF3-14421-13 &
CF3-10590-12**

On Appeal from the Superior Court of the District of Columbia<br>Criminal Division

BEFORE: BLACKBURNE-RIGSBY, EASTERLY and McLEESE, <em>Associate Judges.</em>

## J U D G M E N T

     This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

     ORDERED and ADJUDGED that the convictions on appeal are affirmed. The matter is remanded solely for merger of appellants Clark's and Hilton's counts of possession of a firearm during a crime of violence ("PFCV") arising from the first armed robbery and armed carjacking of Cornell Scott.

For the Court:

JULIO A. CASTILLO<br>Clerk of the Court

Dated: October 6, 2016.

Opinion by Associate Judge Anna Blackburne-Rigsby.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

FILED 10/6/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Nos. 14-CF-565, 14-CF-625 & 14-CF-638

RAYSHAWN CLARK, DWAYNE HILTON, and PERNELL LEE, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-10591-12, CF3-14421-13 & CF3-10590-12)

(Hon. Anita Josey-Herring, Trial Judge)

(Argued May 5, 2016                    Decided October 6, 2016)

*Marie L. Park* for appellant Clark at the time of oral argument.

*Cecily E. Baskir* for appellant Hilton.

*Silvana Naguib*, Public Defender Service, with whom *James Klein* and *Samia Fam* were on the brief, for appellant Lee.

*Timothy R. Cahill*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Natalia Medina*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, EASTERLY, and MCLEESE, *Associate Judges*.

BLACKBURNE-RIGSBY, *Associate Judge*:    In these consolidated cases,

appellants Rayshawn Clark, Dwayne Hilton, and Pernell Lee appeal their

convictions related to an armed carjacking, multiple armed robberies, and subsequent flight from police in the early hours of June 17, 2012.[1] This case presents two significant issues: (A) whether the trial judge should have excluded complainant Cornell Scott's in-court identifications of Clark and Lee, or imposed some lesser sanction, because the complainant called a detective to discuss his "refreshed recollection" of his assailants during the trial, and (B) whether the evidence was sufficient to support Hilton's and Lee's convictions. Appellants raise five other issues that we address more summarily.[2] We affirm and remand solely for merger.

---

[1] Appellants Clark and Hilton were each convicted of one count of conspiracy, D.C. Code § 22-1805a (2009 Supp.); one count of armed carjacking, D.C. Code §§ 22-2803, -4502 (2001); three counts of armed robbery, D.C. Code §§ 22-2801, -4502 (2009 Supp.); four counts of possession of a firearm during a crime of violence ("PFCV"), D.C. Code § 22-4504 (b) (2009 Supp.); and three firearm counts, D.C. Code §§ 22-4504 (a) (2009 Supp.) (carrying a pistol outside the home), 7-2502.01 (2009 Supp.) (unregistered firearm or "UF"), 7-2506.01 (2009 Supp.) (unlawful ammunition or "UA"). Appellant Lee was convicted of one count each for robbery, PFCV, UF, reckless driving, D.C. Code § 50-2201.04 (2005 Supp.), fleeing a law enforcement officer, D.C. Code § 50-2201.05b (2005 Supp.), and unregistered firearm with a prior conviction, D.C. Code § 22-4503 (a)(1) (2011 Supp.).

[2] Specifically, appellants also argue that (1) the trial judge should have ordered a competency evaluation of Clark *sua sponte*, (2) the trial judge should have excluded victim Tyaron Scott's "surprise" in-court identification of Hilton, (3) the trial judge erred in limiting cross-examination of a fact witness regarding Hilton's cell phone, (4) the trial judge's response to a jury question amounted to an impermissible anti-deadlock charge, and (5) Clark and Hilton's PFCV convictions arising from the carjacking and first armed robbery of Cornell Scott should merge.

(continued . . .)

## I. Background

In short, the evidence at trial showed that appellants Clark, Hilton, and Lee committed multiple armed robberies in Washington, D.C. They first robbed complainant Cornell Scott, taking items from his person and his truck from his driveway. They next robbed complainant Tyaron Scott, who walked by during the robbery of Cornell.[3] The robbers drove away, but they had left behind a cell phone at the scene, and they returned and robbed Cornell a second time in an unsuccessful attempt to recover the phone. During the second robbery, police arrived and appellants fled in an SUV. The exact role each appellant played in the series of crimes is not crystal clear, but strong evidence tied each of them to the crime spree — Clark and Lee were apprehended while fleeing, and Hilton's cell phone was recovered from the scene of the robberies.

Specifically, in the early morning of June 17, 2012, complainant Cornell Scott arrived at his home on the 5600 block of 14th Street, Northwest, Washington,

---

(. . . continued)
The government concedes the last issue, and we agree that Clark and Hilton should each have one count of PFCV vacated on remand. *See Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999).

[3] Because the complainants have the same surname (though they are not related), we refer to them by their first names in the interest of clarity.

D.C. When Cornell was about to enter his house, a car pulled up. The passenger pretended to be lost and exited the vehicle to ask for directions, but, as Cornell approached the passenger, he smacked Cornell in the nose with a gun.

Two men dragged Cornell toward the street, and each held a gun to the back of Cornell's head as they searched his pockets. The robbers found keys to Cornell's truck, and a third man took the keys and entered the truck. The truck was equipped with an alarm, but Cornell explained how to disable it, and the third man drove the truck away. The robbers also took Cornell's personal effects but, in an apparent oversight, not his cell phone.

Just after the third robber drove Cornell's truck away, complainant Tyaron Scott walked by on the sidewalk. While one robber continued to hold Cornell at gunpoint, the other robber (later identified as Hilton) robbed Tyaron of over $600 in cash. Although the robber instructed Tyaron to run away, Tyaron did not go very far and was able to watch the men get into a black SUV and drive away. The initial robberies happened "real quick," lasting no more than five minutes overall.

Cornell walked back toward his house and found a cell phone on the ground, and he called 911 with his own cell phone to report that he had been "carjacked."

An SUV soon arrived, and one man (later identified as appellant Clark) exited, pointed a gun at Cornell, and asked either, "Where's my phone?" or "Where's the phone?"  The robber then took Cornell's cell phone, which was still in his hand after he had called 911, but did not recover the cell phone that had been left behind.  Another man in the SUV yelled that police were approaching, Clark ran back to the vehicle, and the SUV sped away.

After a high-speed chase through residential neighborhoods, the SUV hit the curb and flipped onto its roof.  Two occupants of the vehicle crawled out and started to run down 4th Street, and a police officer pursued them on foot.  The two fleeing men ran in different directions, and the officer pursued and detained only the driver, identified as Lee.

Clark was injured in the wreck and remained in the flipped SUV.  Police officers searched Clark's pockets and recovered Cornell's personal effects. Investigators recovered one handgun from the wrecked SUV and another handgun lying nearby.

Cornell gave the police the cell phone that one of the robbers had left behind.  Around 5:30 a.m. on the morning of the robberies, that cell phone rang

while on MPD Detective Wheeler's desk at the police station. Detective Wheeler called the number from the incoming call and reached Francine Lowe, who stated that she had been calling her brother Hilton and that the cell phone belonged to him.

The jury convicted both Clark and Hilton of one count of conspiracy, three counts of armed robbery, one count of armed carjacking, and four counts of PFCV (plus four related firearm offenses for Clark and three for Hilton). Notably, Lee faced the same charges as Clark and Hilton, but the jury convicted Lee of only one count of robbery, fleeing a law enforcement officer, reckless driving, and PFCV (plus two related firearm offenses). They received prison sentences of thirty-one years (Clark), twenty-five years (Hilton), and eight years and eight months (Lee). These consolidated appeals followed.

## II. Discussion

We address appellants' claims in three groups: (A) Cornell's "refreshed recollection" leading to his identification of Clark and Lee, (B) the sufficiency of the evidence supporting Hilton and Lee's convictions, and (C) appellants' other claims. We provide additional procedural history as relevant.

## A. In-Court Identifications by Cornell

Clark argues that the trial court abused its discretion by allowing Cornell to make an in-court identification based upon a "refreshed recollection" that was inherently unreliable and, alternatively, by excluding any evidence that Cornell had discussed his "refreshed recollection" with an MPD detective in violation of the court's witness sequestration order. During direct examination on the first day of trial, Cornell indicated that he was not sure if he could identify the robbers but he "might" be able to. Despite an admonition not to discuss his testimony, Cornell called the lead detective, William Xanten, the next morning. Cornell told Detective Xanten that overnight he came to believe that he recalled enough about the robbers to make in-court identifications of two of the three defendants (without specifying which ones). According to the prosecutor's disclosure letter, Cornell did not otherwise discuss his testimony, and the prosecutor promptly notified all three defense lawyers about the conversation on the day that it occurred.

The trial resumed the following week, and defense attorneys for all appellants proceeded to voir dire Cornell, who explained that his memory of his assailants returned with time. He stated that the only thing Detective Xanten had told him during the call was, "Sometimes, when people come to court, they change

their looks, and they look different." Cornell did not otherwise discuss his testimony with Detective Xanten, and he did not think he was violating any rule about discussing testimony because he felt that he had to tell someone about a development in the case.[4]

The voir dire revealed Cornell's belief that he could identify Clark and Lee but not Hilton. The government did not plan to elicit the identifications, but Hilton's counsel requested to admit them on cross-examination to bolster his defense. Clark's counsel and Lee's counsel objected, and the government deferred to the court on the issue. The trial court credited Cornell's explanation of his revived memory and good faith in contacting Detective Xanten. Clark and Lee requested cross-examination regarding the call, but the trial court refused; its only "sanction" was to prevent the government from eliciting the identifications on direct examination. When asked by Hilton's counsel on cross-examination, Cornell identified Clark as the perpetrator of the second armed robbery who asked

---

[4] Ideally, Cornell should have waited until he completed his testimony before informing the prosecutor about his "refreshed recollection," with the possibility of being recalled as a witness later. Detective Xanten was the lead detective on the case, and Cornell may not have recognized the importance of waiting to disclose his new recollection or the distinction between speaking with the detective (another witness) and speaking with the prosecutor.

about the cell phone and Lee as the initial robber who had lured Cornell forward by asking for directions.[5]

We need not decide whether the trial court adhered to due process or evidentiary requirements when it permitted Cornell to identify Clark and Lee in court and precluded counsel for those defendants from questioning Cornell about the context of his in-court identifications, because, on this record, we can safely conclude that any error was harmless. *See Perry v. New Hampshire*, 132 S. Ct. 716, 727–28 (2012) (concluding that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness"); *United States v. Hunter*, 692 A.2d 1370, 1374 (D.C. 1997) (emphasis added) ("[E]xcept in a *very narrow class of cases . . .* it is the function of the jury to determine whether eyewitness identification is reliable."). *But see Sheffield v. United States*, 397 A.2d 963, 967 (D.C. 1979) ("A defendant may challenge the admission of such testimony by raising a timely objection to its admissibility at trial on the ground that under the law of evidence

---

[5] Although Lee joined Clark in objecting at the time, only Clark has appealed this issue. The government argues for plain error review, but Clark's counsel preserved this issue by objecting to both the admission of the identification itself and the exclusion of any reference to the call to Detective Xanten.

testimony is so inherently weak or unreliable as to lack probative value.").[6] The jury was aware of the potential unreliability of Cornell's identifications because he was initially unable to identify Clark and Lee on the first day of his testimony. Moreover, Cornell only identified Clark as the perpetrator of the second armed robbery, and the record contained overwhelming evidence that Clark was one of the three occupants of the SUV that fled the scene of the second robbery because he was injured in the wreck and apprehended at the scene.[7] The government also did not highlight this identification evidence in its closing or rebuttal. Finally, although Lee does not appeal this issue, Cornell's identification of Lee as a participant in the first armed robbery was also harmless; the jury did not rely on his identification of Lee because the jury acquitted Lee of the first armed robbery.

---

[6] *See Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946) (no reversal if the court, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, [can conclude] that the judgment was not substantially swayed by the error"). Clark does not argue that the more stringent harmlessness standard for constitutional error should apply. *See Chapman v. California*, 386 U.S. 18, 25–26 (1967).

[7] As explained herein, Clark's presence in the SUV during the second robbery was also sufficient to support co-conspirator liability even if he did not commit the crime himself. See *infra* Part II (B).

## B. Sufficiency of the Evidence

"We review the sufficiency of the evidence in a light most favorable to the government, giving it the benefit of all reasonable inferences. It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Gonzalez v. United States*, 859 A.2d 1065, 1067 (D.C. 2004) (quoting *In re M.I.W.*, 667 A.2d 573, 575 (D.C. 1995)). Hilton argues that the evidence was insufficient to support his conviction for carjacking because Cornell's truck was not in his "immediate actual possession."[8] Hilton and Lee also challenge their convictions for the second armed robbery of Cornell, relying on Cornell's identification of Clark as the second robber and arguing that the evidence does not support either conspiracy or aiding-and-abetting liability. We address these contentions in turn.

---

[8] "A person commits the offense of carjacking if, by any means, that person knowingly or recklessly by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, or attempts to do so, shall take from another person *immediate actual possession* of a person's motor vehicle." D.C. Code § 22-2803 (a)(1) (emphasis added).

**1. Scope of the Carjacking Statute**

This court's decision in *Sutton v. United States*, 988 A.2d 478 (D.C. 2010), dealt with a similar situation in which a victim's vehicle was stolen shortly after he parked and walked away from the vehicle. Hilton argues both that *Sutton* can be distinguished and that it was wrongly decided. Because overruling *Sutton* would require an *en banc* decision, *see M.A.P v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), we focus on whether *Sutton* controls the result in this case, and we conclude that it does.

In *Sutton*, the victim had parked his car and walked about three car lengths (forty-five to fifty feet) before he was confronted by the defendant and his confederates. 988 A.2d at 481, 489. Sutton held up the victim at gunpoint while other assailants took his keys, and the victim ran and jumped over a nearby fence before the assailants drove his car away. *Id*. at 481. This court explained that the touchstone of the "immediate actual possession" inquiry is whether the victim was close enough to the vehicle at the time of the theft to have "prevented its taking" but for the defendant's use of force. *Id*. at 489. The statute does not require that the victim have the subjective intent to drive the vehicle at the time of a carjacking. *Id*. Accordingly, we affirmed Sutton's conviction, even though the victim was

walking away from the car and fled further after being held at gunpoint, because he was close enough to his car to have intervened in the theft when he was initially robbed (and, therefore, was "carjacked"). *Id.*

The facts of this case are not meaningfully distinguishable from *Sutton*. Cornell may not have intended to drive his truck at the time of the crime, but his intent does not control. The dispositive question is whether Cornell was close enough to the truck to have intervened, and he testified that he was a mere ten feet away. Thus, Cornell was much closer than the victim in *Sutton* (who was forty-five to fifty feet away), and Cornell could have prevented the theft of his vehicle if not restrained at gunpoint.[9] Therefore, the evidence was sufficient to satisfy the "immediate actual possession" element of carjacking.[10]

---

[9] In fact, Cornell's immediate presence facilitated the taking of his vehicle because the perpetrators' use of force compelled him to explain how to disable the car alarm.

[10] We summarily dispose of Hilton's argument that the evidence did not show his involvement in the carjacking. Cornell testified that two men held guns to his head while a third drove his truck away. Thus, Cornell's testimony supports a finding that all three appellants were active participants in the carjacking, and Hilton offers only speculation that he might have taken the place of an unknown fourth perpetrator between the initial robberies and the second robbery of Cornell. *See Downing v. United States*, 929 A.2d 848, 857–58 (D.C. 2007) (affirming carjacking conviction where defendant agreed to participate in a robbery, knew a gun would be used, and helped put victim into the trunk of her car).

## 2. Co-Conspirator Liability

To prove a defendant's guilt as a co-conspirator, the government "must prove that an agreement existed, that a substantive crime was committed by a co-conspirator in furtherance of that agreement, and that the substantive crime was a reasonably foreseeable consequence of the agreement."[11] *Wilson-Bey v. United States*, 903 A.2d 818, 840 (D.C. 2006) (en banc). The government need not prove that the co-conspirator aided in the actual commission of the crime. *Id*. Hilton and Lee concede that there was sufficient evidence of a conspiracy to commit the initial armed robberies of Cornell and Tyaron. Nevertheless, they argue that the second armed robbery of Cornell (1) was a discrete event separate from any participation in the initial robberies of Cornell and Tyaron and (2) was not a reasonably foreseeable result of the conspiracy to commit the initial robberies.[12]

---

[11] The classic example of a foreseeable consequence is an accidental shooting during an armed robbery — all conspirators are liable so long as they knew a gun would be used. *See Snowden v. United States*, 52 A.3d 858, 866 (D.C. 2012).

[12] The parties also briefed aiding-and-abetting liability, but we need not consider that alternative theory because we conclude that the evidence was sufficient to support the jury's verdict under a co-conspirator theory.

To prove a conspiracy, the government need only prove that the conspirators "agreed upon their fundamental goal," and the details may be improvised or refined as the crime unfolds. *Collins v. United States*, 73 A.3d 974, 983 (D.C. 2013). Moreover, "all parties are guilty for deviations from the common plan which are the foreseeable consequences of carrying out the plan." *Snowden, supra* note 11, 52 A.3d at 866 (quotation marks omitted). Hilton and Lee contend that a second robbery of Cornell was unforeseeable when the reason for returning was merely to recover Hilton's phone.

We agree that a member of a conspiracy is not liable for all actions of a co-conspirator to conceal a conspiracy once the criminal objectives have succeeded or failed. *See Grunewald v. United States*, 353 U.S. 391, 400 (1957). In other words, the mere existence of a criminal conspiracy is not enough to infer a "subsidiary conspiracy to conceal." *Snowden, supra* note 11, 52 A.3d at 867. In this case, Hilton and Lee argue that their involvement in the conspiracy ended once the initial armed robberies had been completed. Even assuming that is correct, Hilton and Lee do not seriously dispute that the jury could find an agreement to recover Hilton's phone. Thus, the record reflects a limited subsidiary conspiracy to recover evidence the robbers had left behind (without merely implying an indefinite plan to conceal the initial robberies), and Hilton and Lee are liable for

any foreseeable criminal acts of Clark in furtherance of that subsidiary conspiracy. *Cf. United States v. Upton*, 559 F.3d 3, 11–13 & n.6 (1st Cir. 2009) (explaining that jury could infer that money laundering conspiracy was ongoing where co-conspirators acted in concert to conceal it (specifically, when both co-conspirators failed to file tax returns in 1999) without considering unilateral acts to conceal (for example, when one co-conspirator filed a false 1997 tax return in the year 2000)).

The second armed robbery of Cornell was a foreseeable consequence of the subsidiary conspiracy to conceal (i.e., the plan to return to Cornell's residence to recover Hilton's phone). The conspirators knew Cornell had been at his residence just a few minutes earlier when he was initially robbed, and they knew that Clark had a gun.[13] It was thus foreseeable that Clark would threaten Cornell with the gun and grab Cornell's phone in a rushed and mistaken belief that it was Hilton's phone during this second armed robbery, ostensibly to conceal the first armed robbery. *See, e.g.*, *Wilson-Bey*, *supra*, 903 A.2d at 841 (emphasis added) (co-conspirator liable for "*unintended crimes* that result from intentional participation

---

[13] For this section of the analysis, we assume, as Hilton and Lee do, that the jury credited Cornell's identification of Clark as the perpetrator of the second armed robbery. Nevertheless, the identity of the actual second armed robber is not essential because all three are liable under a co-conspirator theory. Sufficient evidence placed all three men in the SUV. Among other evidence, Clark was apprehended in the wreck, Lee was apprehended on foot, and Hilton was identified as the third man who escaped by the recovery of his phone.

in a predicate crime, without proof of the *mens rea* otherwise required for the subsequent crime"). We think it would also be foreseeable from the evidence that Clark, in confronting Cornell again, would attempt to take any remaining items of value.

To be clear, we do not indefinitely impose liability for a co-conspirator's efforts to conceal a conspiracy. *See Snowden, supra* note 11, 52 A.3d at 867. Here, however, the evidence supports a finding of a common plan among Clark, Hilton, and Lee for Clark to recover Hilton's cell phone from Cornell's front yard. Because Hilton and Lee could foresee (1) that Cornell would be at his residence (because he had been there just minutes earlier and appellants had taken his vehicle) and (2) that Clark would be armed, it was foreseeable that Clark would again use a gun to take items from Cornell.

Lee raises one further issue because the jury acquitted him of the conspiracy charge (but convicted Clark and Hilton of conspiracy). Lee argues that this court cannot consider co-conspirator liability when evaluating his sufficiency challenge. This argument is foreclosed by our sufficiency analysis in *(Anthony) Richardson v. United States*, 116 A.3d 434, 443 (D.C. 2015), which affirmed on a co-conspiracy theory of liability for one count even where the jury acquitted the defendant of a

separate conspiracy count. We explained that "the apparent contradiction is, at most, an inconsistent verdict . . . . There is no reason to vacate appellant's conviction . . . merely because the verdicts cannot rationally be reconciled." *Id.* (internal quotation marks and alterations omitted).[14] Thus, we must still consider a conspiracy theory of liability in our sufficiency review. As explained above, sufficient evidence supports a finding that Lee was a co-conspirator liable for the foreseeable second armed robbery of Cornell.

## C. Other Claims

We briefly address appellants' remaining arguments in turn: (1) that the trial judge should have ordered a competency evaluation of Clark *sua sponte*, (2) that

---

[14] Lee's reliance on appeals from bench trials is misplaced. When a trial judge acts as the fact-finder and makes specific findings on the record, we can review the sufficiency of those *findings*, and we may remand if the trial court left a dispositive factual dispute unresolved, *see Williams v. United States*, 887 A.2d 1000, 1003–04 (D.C. 2005), or reverse outright if the trial court made a factual finding that cannot satisfy an element of the crime, *see Cave v. United States*, 75 A.3d 145, 147 (D.C. 2013). In contrast, jury verdicts are entirely insulated from review for consistency (1) to prevent the government from seeking review of the inconsistent acquittal; (2) to protect the secrecy of jury deliberations; and (3) to protect the jury's right to nullify inconsistent with the law. *See United States v. Powell*, 469 U.S. 57, 68–69 (1984). We instead review only the trial court's decision to submit each count to the jury, with our review of the sufficiency of the evidence on each count acting as a "safeguard[] against jury irrationality." *Id.* at 67.

the trial judge should have excluded victim Tyaron Scott's "surprise" in-court identification of Hilton, (3) that the trial judge erred in limiting cross-examination of a fact witness regarding Hilton's cell phone, and (4) that the trial judge's response to a jury question amounted to an impermissible anti-deadlock charge.

### 1. Clark's Competence to Stand Trial

The Incompetent Defendants Act defines "competence" to stand trial as "sufficient present ability to consult with [one's] lawyer with a reasonable degree of rational understanding" and to have a "rational, as well as factual, understanding of the proceedings." D.C. Code § 24-531.01 (1) (2012 Repl.); *see also Drope v. Missouri*, 420 U.S. 162 (1975) (holding Due Process Clause requires competence). When defense counsel has not raised the issue at the trial level, this court accords "great deference to the trial court's inference from its personal observations of, and conversations with, the defendant," and we review the failure to order a *sua sponte* competence evaluation for abuse of discretion. *Gorbey v. United States*, 54 A.3d 668, 679 (D.C. 2012).

To raise a competence issue, Clark must identify "red flags" during the course of the trial process that "inescapably call into question appellant's

competence to stand trial." *Id*. (quoting *Clyburn v. United States*, 381 A.2d 260, 263 (D.C. 1977)). Clark relies upon a few references to his mental health history during the course of the trial proceedings. The pretrial report and presentence report both referenced some mental health conditions dating back to Clark's childhood. The last reported symptoms occurred in 2010, however, two years before the charged crimes.

We conclude that these limited "red flags," consisting solely of mental health issues predating the trial process, were insufficient to require a *sua sponte* competency evaluation. The competence inquiry involves many factors, of which mental health history is just one — others include the defendant's behavior at trial, his rational or irrational actions, and the representations of defense counsel. *See Gorbey, supra,* 54 A.3d at 678. The other factors suggest competence. Clark's counsel explained his client's understanding of the case at various points in the trial process.[15] The record also contains some statements from Clark that confirm Clark's rational understanding of trial process.[16] Further, Judge Josey-Herring

---

[15] For example, Clark's counsel confirmed that his client understood the proceedings when explaining the rejection of two plea offers and the decision not to pursue DNA testing under the Innocence Protection Act.

[16] The trial court often asked questions multiple times with different phrasings to check Clark's comprehension. For example, when waiving DNA

(continued . . .)

conducted an inquiry during trial itself to confirm that Clark understood and knowingly waived his right to testify. *See Boyd v. United States*, 586 A.2d 670, 678–79 (D.C. 1991). Under these circumstances, even assuming that a trial court has the same duty to inquire into a defendant's mental health status as his own counsel, *see Blakeney v. United States*, 77 A.3d 328, 342 (D.C. 2013), the court did not abuse its discretion because the very limited "red flags" in the record did not call Clark's competence to stand trial into question.

### 2. "Surprise" In-Court Identification of Hilton by Tyaron

Ten days after the robberies, police presented Tyaron with a nine-person photo array containing Hilton's picture, but Tyaron selected a "filler" photo instead. Nevertheless, Tyaron surprised all parties at trial by testifying that he was confident enough in his recollection to make an in-court identification of Hilton. Hilton's counsel addressed the pretrial misidentification in the photo array on cross-examination. On appeal, Hilton argues that the in-court identification, while admissible, came as a prejudicial "surprise" that required the trial court to grant a

---

(. . . continued)
testing, Clark was given the opportunity to say "yes" that he understood his right, "no" that he did not want additional testing, and "yes" that he was satisfied with the testing already done. Additionally, Clark wrote a coherent letter proclaiming his innocence to the judge presiding over his case in December 2013.

mistrial because Hilton otherwise might have called an identification expert to rebut the identification by Tyaron.

We see no such prejudice by the surprise identification. Significantly, Hilton sought only a mistrial without suggesting less burdensome corrective action — for example, a continuance to further prepare for cross-examination. Moreover, we have said an in-court identification, by itself, is "an inherently suggestive type of identification," *McCall v. United States*, 596 A.2d 948, 951 (D.C. 1991), and the government's evidence against Hilton was strong (e.g., his cellphone and DNA evidence). With neither a disclosure violation nor a challenge to the admissibility of the identification,[17] we cannot conclude that the denial of a mistrial was an abuse of discretion.

---

[17] Unexpected evidence does not necessarily require a mistrial, and reversible error occurs only when "(1) the prosecutor makes a pretrial representation of the government's intention that creates an obligation to inform the defense and the trial court of new information in a timely manner, (2) the prosecutor fails to honor his or her pretrial obligation, and (3) the defendant is prejudiced." *Bellamy v. United States*, 810 A.2d 401, 404 (D.C. 2002) (internal quotation marks and alterations omitted). The record does not reflect any disclosure violation.

### 3. Limited Cross-Examination about Hilton's Cell Phone

At trial, the government called Francine Lowe, Hilton's sister, to testify about his cell phone, which she had called on the morning of the robbery. On cross-examination, Hilton wanted to elicit testimony that Lowe had seen Hilton give his phone to other people in the general time frame of June 2012. The trial judge sustained an objection by Clark's counsel because Hilton's counsel had not established that Lowe had any knowledge about Hilton loaning his phone during the specific time frame of the robberies, and the more general time frame (the entire month of June 2012) was not relevant. We review the trial court's relevance determination for abuse of discretion, *see United States v. Mosby*, 495 A.2d 304, 305 (D.C. 1985), and discern no abuse in this case.

Relevance is a fairly low bar, requiring only that the evidence tend to make a material fact more or less probable. *See (Troy) Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014). Nevertheless, the defendant must establish a nexus between the proffered evidence and the charged crimes and cannot invite speculation about a third party's guilt. *See (Todd) Thomas v. United States*, 59 A.3d 1252, 1264 (D.C. 2013). Here, Hilton's proposed question was broad and unsupported by an adequate proffer. The proposed question about Hilton having

loaned his phone to anyone was generic. Counsel did not explain the frequency or duration of the loans; offer to limit her question to a specific person with opportunity to commit the crime; or respond to Clark's concern that the answer would invite impermissible speculation damaging his case. In light of this proffer, the trial judge permissibly concluded that Lowe's response would have left the jury to speculate about a third-party perpetrator (or prejudice Hilton's co-defendants) and carried a risk of distracting the jury. *See Winfield v. United States*, 676 A.2d 1, 4–5 (D.C. 1996) (en banc).

### 4. Response to Jury's Deadlock Inquiry

After deliberating for about a day and a half, the jury sent a note that read:

> In filling out the jury verdict form, we are allowed two options, "not guilty" or "guilty," we have been discussing all morning, & for some counts we are unable to come to a unanimous decision. In the case that the jury does not agree on a specific count, how do we fill out the form?

The trial judge denied appellants' motions for a mistrial because the jury had been deliberating for a relatively short time in "a very complicated three co-defendant" case, and she also concluded than an anti-deadlock charge would be premature. No party objected to the trial judge's proposed response, but, based upon an apparent transcription error, all three appellants argue on appeal that the trial judge

improperly required unanimity on all charges. *See generally Winters v. United States*, 317 A.2d 530, 533–34 (D.C. 1974) (en banc).

When there is a possible error in the record, it must be clarified by the trial court. D.C. App. R. 10 (e)(1); *see (Trenton) Thomas v. United States*, 715 A.2d 121, 126 (D.C. 1998) (per curiam) (Schwelb, J., concurring). The government filed a motion to clarify the record in the trial court, which was granted on July 8, 2016, revealing that the actual instruction read as follows: "I have received your jury note at 1:10 signed by Juror 564. At this time, I will only take verdicts regarding a charge or charges where there is a unanimous verdict -- that is, where there is total agreement by each member of the jury as to a charge or charges."

With the benefit of this clarification of the record pursuant to Rule 10 (e)(1), we now know that the trial court's instruction required only that the jury continue its work after relatively short deliberations. We review its instruction for plain error. *See Trapps v. United States*, 887 A.2d 484, 490–91 (D.C. 2005). The trial court's instruction was not really an "anti-deadlock charge" at all, as its response "boiled down to 'please keep trying.'" *Van Dyke v. United States*, 27 A.3d 1114, 1124 (D.C. 2011). Moreover, the length of deliberations after an instruction can demonstrate a lack of coercion, and in this case the jury deliberated for an

additional day before returning unanimous verdicts. *See id.* (stating that continued deadlock two hours after an instruction indicated a lack of coercion). Under the circumstances, we discern no plain error in the trial court's instruction requiring the jurors to keep trying while offering an opportunity to return unanimous verdicts on some counts.

## III. Conclusion

The convictions on appeal are affirmed. We remand solely for merger of Clark and Hilton's PFCV counts arising from the first armed robbery and armed carjacking of Cornell Scott.

*So ordered.*